TORRANS *v.* TEXARKANA GAS & ELECTRIC COMPANY.

Opinion delivered November 16, 1908.

TRIAL—DIRECTING VERDICT.—It was not error to direct a verdict for the defendant, in an action against a gas company for causing an explosion, if, giving the evidence its strongest probative force, plaintiff failed, upon any reasonable view of the evidence, to establish a cause of action.

Appeal from Miller Circuit Court; *Jacob M. Carter,* Judge; affirmed.

STATEMENT BY THE COURT.

Appellant was a milliner in the city of Texarkana, Arkansas. The store she occupied was eighty feet long, twenty-five feet wide, and sixteen feet from floor to ceiling. Appellee was a corporation engaged in the manufacture, distribution and sale of gas in Texarkana. Appellant employed appellee to install two arc lamps in her store. These depended from the ceiling. One was placed in the rear end, about twelve feet from the rear end wall, and midway between the side walls east and west. The other was placed in the front end. The lamps were supplied

with gas by a pipe which entered from the front and ran along
the side of the front end wall to the ceiling, then along the cen-
ter of the ceiling over the lamps. The lamps hung about six
feet below the ceiling, and were connected with the gas pipe
above by a pipe which made an elbow at the ceiling. Each lamp
had three burners, which were supplied with gas by feeders. A
pilot light which was designed to burn continuously was con-
nected with each lamp. The pilot light burned with a flame
about a half inch high. The lamps were lighted by pulling a
chain which opened a valve to the gas pipe and were extinguished
by also pulling a chain which closed the valve. A meter was
connected with the gas pipe which measured the flow of gas,
showing the amount consumed. On the fourteenth of Septem-
ber, 1907, the day the lamps were put up, parties in the store
could not light the lamps, and the agent of the gas company came
and lighted them with a taper. Again Monday night following
(the 16th) the parties in the store could not light the lamps,
and again the agent of the gas company came and lighted them
with a taper. He said: "Your lights are all right." The lamps
were not lighted any more until the succeeding Saturday night
(21st). That night the lamps were lighted without any trouble.
The trouble about lighting the lamps was on the previous nights.
The lights burned Saturday night from about seven till nine
o'clock, and had burned about the same time the previous nights
when they were lighted. Sunday morning about 9:30 o'clock,
September 22d, a fire occurred in appellant's store. Parties in
proximity to the building at the time first discovered the fire
by the smoke that came from the building. There was no noise
of any explosion. Those first in the building, members of the
fire department, discovered a little fire in the back part of the
store, and near the west wall. A considerable hole in the ceiling
had burned out there, and there were evidences of where the fire
had burned up the west wall through the shelving. The police-
man and the chief of the fire department and some of the firemen
who were the first in the building testified that they first discov-
ered the fire in the ceiling next to the west wall; one witness
saying that he was one of the first to get there, that it seemed
that the fire caught back on the floor and got up in the ceiling.
Goods or merchandise was burning eight or ten feet from the

wall in the southwest corner. The chief of the fire department said they pulled down the ceiling "where the fire was, and cut another hole for the purpose of getting their heads up through there to see where the fire was spreading." "There was, of course, no fire where we cut the other hole. The second hole was cut right above this arc light." The firemen substantially corroborate the testimony of the chief as to the place where the fire was first discovered and the condition that obtained when they first reached the building, and as to what was done by them after they arrived there. One of them stated: "There was no fire at the place where we pulled the ceiling down in the centre. The ceiling, though, had been burned between that joint and the west wall."

Appellant testified that when she reached her store after the alarm of fire "she found it crowded with people, and as it seemed to her a foot deep in water, she found the firemen were playing water all up in the ceiling around the rear lamp. The fire was out. It was all black, smoking, charred and burning, and the ceiling all around the lamp in the back end of my store was burned. The lamp was pulled down from the ceiling. The ceiling was charred, and the lamp was pulled down on the floor, and the pipe lay against the work table. When asked what was the condition of the ceiling above the lamp, she replied, "It had dropped down on the table and floor and was simply a charred mass." She was asked: "Assuming that the fire started at the rear lamp, what direction did it take?" and answered: "It went towards the west wall. The fire burned to the wall between me and Nasons' (west wall). It burned from the lamp to the wall, that I know." She further testified that her work table was right under the lamp, that it was full of goods, and that these were destroyed, and that the goods were destroyed along the way to the west wall. Witnesses on behalf of appellant who examined the store after the fire, some of them on the day of the fire and others a day or two afterwards, testified substantially that the ceiling was burned from where the rear lamp was suspended clear over the west wall. One of the witnesses testified: "I did not see the fire. I do not know that the flame traveled toward the west wall; but I judge that it did. I found the ceiling pretty badly burned near the place where the split fitting had been on

the ceiling, then westward towards the wall of the building, and my recollection is that it burned more in that direction than it did right where the fitting was." Appellant testified that on Saturday night before she was burned out on Sunday morning, when she was in the act of closing the store for the night, she went back and tried the rear lamp, which had attracted her attention during the week by flaring up so high that she thought the lamp was lit. She had reference to the pilot light that was kept burning during the whole week. The pilot light burned up brighter when she noticed it. Witness detected the odor of escaping gas in the work room on Saturday afternoon before the fire. After the fire, the pipe that connected the rear lamp with the gas pipe on the ceiling was tested by plumbers, and they discovered a leak in the pipe at the elbow where it was joined on to the other pipe at the ceiling. It was a slit in one of the fittings, and when the gas was turned on and a match applied it burned a blaze about a quarter of an inch high, or, as one of the witnesses said: "The flame was about half that of an ordinary match." The employee of the appellee who put up the lamps testified: "I turned on the gas, burned off the mandrel and tested the pipe to see if there was any leak anywhere. I held a match all around the joints that I made in the line, and if there had been any leak anywhere it would have caught on fire. I did not find any leak, I put the L on that pipe in Mrs. Torrans' store. There was no crack or split in it then. I painted this pipe and did not see any split. If there was anything broken about it, I did not find it." The partition between the work room and store room lacked about five feet of reaching the ceiling. There were several broken panes of glass in the back window to the work room. There was an open flue on the west wall about opposite the arc lamp.

The testimony of experts who were familiar with the properties of water gas, the kind used in this building. was substantially as follows: That when water gas is emitted into air it will mix in a proportion which is less than nine per cent. volume, and when it comes in contact with a match or spark there is no action, but when the percentage of water gas mixed with air is more than 9 per cent. and less than 50 per cent. then it will explode very violently. When the percentage of water gas is more than 55 per cent. and it is ignited, it will simply burn throughout the

room. When it is less than 9 per cent. there will be no action at all. That is due to the fact that there is a great excess of air. When gas explodes, it always explodes very violently, and there is always a report from it as the gas expands. A gas explosion in a store room would cause the doors and windows to be blown out. A store room eighty feet long, twenty-five feet wide with ceiling sixteen feet high would contain 32,000 cubic feet, and before it would explode 9 per cent. of that would have to be gas or 2800 cubic feet. When you emit water gas into a room, it will go to the top of the ceiling; and if there are no openings in the ceiling, it will gradually diffuse in the room. It will spread itself through the entire room. It would not confine itself to any particular part of the room. It would first rise to the ceiling, and then if it could not get out it would begin to diffuse and mix with the air generally. If there is a window that is broken out, or there is a flue or holes in the door through which it can escape, it will go out in its natural course through those openings. It would diffuse out in the open air, just as well as in the room. Where there is a leak in a gas pipe a half inch or an inch long, which would light a flame a quarter of an inch high, there could be no danger from the quantity of gas that would escape. There would be no danger from the escaping gas from a pilot light, should it go out, as there would never be enough gas in a room the size of this store to equal 9 per cent. of the volume. You can readily smell gas where there is less than one per cent. in a room.

If any large quantity gets in a room, it will make one very sick. These arc burners would burn forty cubic feet of gas per hour or four hundred cubic feet in ten hours. The pilot light would not burn over a half cubic foot in twenty-four hours. It would not be dangerous if it went out. A flame a quarter of an inch high, such as is described by one of the witnesses who tested the pipe for gas, would not leak more than a half cubic foot in twenty-four hours. The gas meter showed that 500 cubic feet of gas had been consumed by appellant for the month of September.

The above are the facts as developed by the testimony. Appellant filed her complaint against appellee, alleging, after setting up the contract, that the work of putting in pipes for gas

in the store "was done in such careless, negligent and incompetent manner," and the material for piping and lighting the store was "so faulty, defective, insufficient and unsafe as to cause a leakage of gas in the store," which appellee "utterly failed and neglected, in violation of its promise and contract, to remedy, although promptly and repeatedly notified to do so. That, by reason of appellee's negligence in the work done and dangerous material furnished, the gas escaped and came in contact with the burning pilot light of the arc lamp suspended from the ceiling, and by explosion, combustion, or ignition set fire to the goods of appellant, causing their destruction, to appellant's damage in the sum of eight thousand five hundred dollars, for which she prayed judgment." The appellee answered, denying all the material allegations of the complaint. The court directed a verdict for the appellee, and this appeal is duly prosecuted.

*W. H. Ward,* for appellant.

1. A case should not be withdrawn from the jury unless it can be said as a matter of law that no recovery can be had upon any reasonable view of the facts which the evidence tends to establish. The trial court is prohibited from charging the jury with regard to matters of fact, and it is limited to declaring the law. Art. 7, § 23, Const.; 37 Ark. 193; 71 Ark. 447 and cases cited; 77 Ark. 556; 39 Ark. 419; 57 Ark. 468.

2. If there is any evidence, however slight, to sustain a verdict for the plaintiff, it will be sustained, and, on appeal, such evidence will be given its strongest probative force. 76 Ark. 520; 2 Thompson on Trials, 1598-9, § 2245. Where the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, they should be submitted to the jury. 80 Ark. 194. See also 76 Ark. 522; 57 Ark. 461; 66 Ark. 363; 147 N. Y. 536-7.

*Wm. H. Arnold,* for appellee.

1. When the evidence introduced by the plaintiff is unreasonable and contrary to the physical facts, human experience and common knowledge, it is proper for the court to direct a verdict for the defendant. That is the case here. 79 Ark. 68.

2. Where an unimpeached witness testifies positively and distinctly to a fact, and nothing is shown from which an infer-

ence against the fact testified to can be drawn, that fact may be treated as established, and a verdict may be directed based on such evidence. 82 Ark. 86.

WOOD, J. (after stating the facts). It is not shown that appellee was negligent in the manner in which it constructed the arc lights. Its servant who installed them shows that he went over the joints of the pipes with a lighted match after the fittings and pipes had been placed, and that no leak was discernible; that if there had been a leak of any consequence anywhere at that time he would have discovered it with the lighted match. True, the testimony shows that the parties in the store were unable the first two nights the lamps were lighted to light same by the pilot, and sent for the agent of appellee and informed him they were having trouble with the lamps. He responded to the call, lighted the lamps and pronounced them all right. It is not pretended that the pilot light went out after that, or that it failed to light the arc lamp on the last night it was lighted before the fire. The proof shows that the arc lamp was lighted without any trouble on the Saturday night before the fire and burned until it was extinguished by appellant when she left the store. True, witnesses say they detected the smell of escaping gas on Saturday afternoon before the fire. But it is not shown that this fact was communicated to appellee between that time and the occurrence of the fire. Appellant shows that the pilot light had been flaring up during the week after the second night, but she does not prove that she communicated this fact to appellee. So it affirmatively appears from the evidence that appellee, when it installed the lamp and pipes and fittings, went over all and gave it a test that would have detected escaping gas, had there been any. Appellee had no reason to suspect, in the short time intervening between the last visit of its agent to fix the lamps and the fire, that the lamps or pipes had become defective, and it had no notice that such was the case if it really was. So, if it be conceded that the fire was caused by a defect in the pipe or pilot, we are of the opinion that the proof does not show that appellant was negligent in causing or permitting such defect to exist. There was no negligence therefore on the part of the appellee by which the fire was produced.

But we are still further of the opinion that there is no evi-

dence to warrant a conclusion that the fire was caused from escaping gas. The uncontradicted testimony of the experts as to the properties of water gas shows conclusively that the fire could not have been caused by its escaping and coming in contact with the pilot light as-charged in the complaint. The meter showed that only five hundred cubic feet had escaped through the pipe in September. Of this some must have been consumed before the arc lamps were installed. Then these arc lamps, if they burned six or eight hours before the fire as the evidence shows they might have done, would have consumed two hundred and forty or three hundred cubic feet more. So there would have been left a very small quantity, if any, of gas not consumed by the lamps before they were extinguished to have produced the conflagration. There is nothing to show that the meter was defective; no evidence that it did not register accurately the amount of gas that escaped through the pipes. It is certain from the testimony that not enough gas escaped in this way to have produced the fire by explosion. For it would have taken 2,800 cubic feet in a room of that size to have exploded. The proof was conclusive that there was no explosion, none was heard, and the inevitable effects, had there been one, were absent. There was no general combustion over the whole store, as there must have been, had the gas escaped in sufficient quantity to have diffused throughout the store and to have ignited by contact, in this way, with the pilot. That would have required 17,600 cubic feet. The only other way for the fire to have been produced by escaping gas was for the gas to have escaped with such pressure in the direction of the pilot, or the pilot to have flared to such height in the direction of the gas escaping from the slit in the elbow at the ceiling, as to have come in contact. But there is no proof of this. On the contrary, the uncontroverted evidence shows that this would have been impossible. The gas only escaped from the slit with sufficient force to burn feebly, after repeated efforts to ignite it, in a flame, at most, of one-half the strength of an ordinary match, and the pilot only flared high enough to make appellant believe the lamp was lighted. So the pilot flame and the escaping gas, if any, were still some six feet apart. Gas is lighter than air. Its tendency was to rise and go out through openings, or if confined to diffuse with the

air surrounding, not in a stream or in waves, but generally until the whole space is pervaded. Such is the evidence of experts.

We are therefore of the opinion that, giving the evidence its strongest probative force for appellant (*Rodgers* v. *C. O. & G. Rd. Co.,* 76 Ark. 522), it shows no more than that the ceiling above the lamp and between the lamp and the west wall was charred. It certainly does not show (though that was the expressed opinion of appellant and some of her witnesses) that the fire orignated under the lamp, and that it burned from there toward the west wall. Such opinion is mere surmise or speculation. It has no basis of evidence to rest upon. The court therefore did not ignore constitutional limitations in directing a verdict for appellee, and thus declaring as matter of law that appellant had failed, upon any reasonable view of the evidence, to establish her alleged cause of action. The ruling is well sustained by decisions of this court. *Waters-Pierce Oil Co.* v. *Knisel,* 79 Ark. 608; *Neal* v. *St. Louis, I. M. & S. Ry. Co.,* 71 Ark. 447, citing *Catlett* v. *Railway Co.,* 57 Ark. 527; *Texas & Pacific Ry. Co.* v. *Cox,* 145 U. S. 593.

Judgment affirmed.

HILL, C. J., (dissenting). There was a slit in one of the gas pipes which emitted enough gas to burn a flame a quarter of an inch in length. There were defects in the lighting arrangement of both the pilot and arc lamps, and the pilot lamp, instead of burning constantly, would sometimes go out, and there was a perceptible odor of gas in the store room at different times after these gas fixtures were installed, and as late as the afternoon of Saturday preceding the fire early Sunday morning. From these facts it may well have been found that there was negligence in the installation of the gas fixtures. The more doubtful question is whether there was sufficient evidence that the fire resulted from gas escaped from these defective fixtures.

There was evidence tending to prove that the fire originated over one of these lamps and extended from the ceiling above it to the west wall. Several witnesses early on the scene of the fire said the ceiling in close proximity to the gas lamp was more burned than any other part of the building, and the appearance to them was that fire had originated there and spread therefrom. This testimony would, standing alone, evidently be sufficient

to sustain a verdict. The defendant introduced testimony tending to prove that the fire originated on the west side of the building. This presented a square conflict, and, without the experts testifying to the properties of gas, seeking to negative the fire from that cause on scientific principles, doubtless this conflict would have been settled by the jury. The evidence shows that the ceiling of the store room was not air-tight, and there is no evidence of the extent of the openings in the room through which air and gas could escape. ·

There is no evidence of the force or violence of an explosion in such a room as this when the admixture of gas and air barely reached the explosive state, say 9 per cent. gas. Therefore much, if not all, of the scientific testimony, while quite interesting, is wholly inapplicable to the precise point. Moreover, the scientific theory against gas being the origin of the fire is largely based on the amount of gas in the room as shown by the meter, and no evidence to show the accuracy or good order of the meter. In fact, it is really based on a bill for the gas, and the bill is presumed to be based on the meter. This is too unreliable a witness to be the basis for a scientific demonstration.

The case should have gone to the jury.