MAGNOLIA PETROLEUM COMPANY v. SMITH.

Opinion delivered March 6, 1922.

DAMAGES—PERMANENT INJURY TO WELL.—Testimony that on two occasions defendant permitted gasoline to flow into plaintiff's well and to damage the water therein did not justify a finding that the well was permanently injured; there being no testimony that the well was permanently injured, or that the flow of gasoline was continuous, and it being undisputed that gasoline is a volatile liquid which quickly evaporates and is absorbed by the earth.

Appeal from Polk Circuit Court; *James S. Steel,* Judge; reversed.

*Cockrill & Armistead* and *John W. Newman,* for appellant.

There was no evidence to connect any negligence on the part of the defendant with any injury to the plaintiff's well, but the evidence shows that it was contrary to the physical facts. 79 Ark. 608.

Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. 133 Ark. 353. The injury was only temporary. 63 Ark. 536; 95 Ark. 297.

*Pole McPhetrige,* for appellee.

The findings of fact by a court sitting as a jury are conclusive if there is evidence to support them. 90 Ark. 512; 91 Ark. 108; 92 Ark. 41; 100 Ark. 166; 86 Ark. 504.

The findings of a court on conflicting evidence is conclusive on appeal. 104 Ark. 154; 96 Ark. 606; 84 Ark. 359; 88 Ark. 587.

WOOD, J. The appellee instituted this action against the appellant. The appellee alleged that he was the owner of a certain lot in the city of Mena, Arkansas, on which was situated a dwelling house; that there was a well on the premises that cost about $200, which furnished good and pure water for use on the place; that the appellant erected two large oil tanks upon the right-of-way of the Kansas City Southern Railway about eighty feet from appellee's well; that the slope of the ground and drainage from the tanks was towards the well; that the appellant while transferring gasoline from oil cars to its tanks by means of pumps, negligently permitted several hundred gallons of gasoline to be spilled upon the ground, which ran into appellee's well, rendering same wholly unfit for use; that the appellant by the wastage of the oil and gasoline has caused the ground around to be so saturated that the water in appellee's well is contaminated; that the appellee has made every effort to clean the well, but has been unable to do so; that the appellee, through the negligence of the appellant as above set forth, has been compelled to abandon the use of the well on his premises; that he has sustained damages by reason of appellant's negligence as alleged in the sum of $400, for which he asked judgment.

The appellant, in its answer, admitted that it had erected the tanks on the right-of-way as alleged for the purpose of storing oil, petroleum and gasoline, but denied all the other allegations of the complaint. By the consent of parties the cause was tried before the court sitting as a jury.

The appellee testified that he was the owner of the property described in his complaint; that there is a well on the lot 32 feet deep, walled the first eight feet from the bottom with dry brick and the balance of the way to the top with brick cemented together, extending to about two feet above the surface of the ground. About the 8th of August, 1918, the appellee discovered gasoline overflowing from the appellant's tanks, and so informed the pumper. The second day the well was saturated with gasoline, so that it was unfit for use for anything—the chickens and calves would not use it. The appellee had no way of estimating the amount that was wasted, but there was quite a lot of it. Prior to that time the appellee had never had any trouble with his well. It furnished good water. The appellee drew the water out of the well for several days and employed a man to help. After they had lowered the water, appellee let a man down in the well to finish dipping it out, and the man could not stay in there on account of the gasoline. Again about the 22nd of July, 1920, a pump or pipe connecting with the pump burst, and by gravity the gasoline overflowed from the railroad car or tank. The gasoline overflowed considerably around their pump-house, and the well was affected worse at that time than it was before. Still another time appellee discovered that coal oil was wasting, but he had never looked in the well since then. On the morning of the second or third day after the discovery of the wastage of the gasoline the second time appellee drew a lot of water out of his well and had it filtered, and out of the seven gallons of water there was filtered four gallons of gasoline. Appellee had never drawn all of the water out of the well since 1920. When appellee first noticed the gasoline, it was running about twenty feet away from the pump on top of the ground, and the ground was entirely saturated for quite a distance around the pump. Appellee's well was about 115 or 120 feet from where the gasoline was overflowing. The gasoline would come into the well anywhere from the

bottom up to about eight feet.    It could go behind the
wall where it is loose and get into the well by penetra-
tion.    The gasoline would have to go down about twenty-
four feet to get under the cemented and brick wall.    It
couldn't get into the well from the top of the ground.
Appellee didn't know what it cost him at the time he
fixed up the well.    The lowest estimate that he received
from well diggers was $150.    He did the work prin-
cipally himself.    He did not live on the property but
rented the same to a tenant, and the tenant used water
from a neighbor's well about 115 feet away.    It was
claimed that gasoline also got in this well, but they kept
bailing it out, and it got all right.    There is a dwelling
house on the lot, with three rooms.    The appellee rent-
ed the same for $4 per month.    When appellee first
discovered gasoline in the well, the property was renting
for about half what it now rents for.

Appellee was asked what it would cost to draw all
the water out of the well at one time and stated that he
guessed it would cost about $5.    He further stated if
they would get the gasoline out of the brick and ground
all around it would be pure water, he supposed.    Witness
further gave it as his opinion that the oil and gasoline
could not get into the well from any other tanks than
those of the appellant.    There had never been any oil in
the well of the description that the railroad companies
used.    In digging the well appellee went down eight or
ten feet through dirt and shale before he struck the solid
rock.

Another witness testified that he assisted the ap-
pellee at the time indicated in drawing the water out
of his well.    The water was not fit for use.    They drew
the water out of the well and witness went down to
dip up some, but could not breathe because there was
either coal oil or gasoline in the well.    The fumes
were like the fumes of gasoline—affected witness' eyes.
Witness offered to dig a well for the appellee about
thirty-three feet deep for $150 and cement the top

and not wall it.    Witness did not know whether it was gasoline or coal oil in the well.   Some kind of white oil.

A witness, who was the tenant of the appellee, testified that he lived on the place previous to the time the gasoline got in the well and used the water out of it all the time until August, when the gasoline got in the well, and witness stopped using it and had not used it since because it had been unfit for use.   Witness knew when appellee drew the water out of the well and filtered it and got gasoline out of it.   Witness knew it was gasoline because he used it to run his car.   The well got worse after that, and it was worse along in July, 1920.

Another witness testified that he lived on the place in 1918; that gasoline got in the well in 1918, and then it cleared up and got a little better.   They drew it out several times, but never did draw it all out at once.   Witness knew that they had filtered gasoline out of the water.

Another witness testified that he was passing the appellee's place on one occasion two or three years before and saw that the gasoline tanks were leaking.   He called the attention of the party living on the place to this fact.   It was about three o'clock in the afternoon.   There was no one at the tank at the time.   Witness judged that it was overflowing at the rate of four or five hundred gallons a minute.   Witness did not notice any on the ground except what was under the tank.   The next day the tenant called witness' attention to the well, and there appeared to be oil or something in the well.   Witness did not know what it was.

The State manager of the appellant testified that he investigated the condition of the ground around the tanks of the appellant at Mena.   He measured the place from where the gasoline cars were unloaded to appellee's well, and it was approximately 138 1-2 feet, which would make it about 118 feet from the pump where appellee claimed the gasoline overflowed to his well.   The drainage from the point where the overflow had occurred was not in the direction of the appellee's well, but was toward

the curve in the road, which was situated between the pump and the well, and there was a ditch on each side of the road approximately five inches—that is, the road bed was five inches higher than the ditch. The gasoline, if enough of it should overflow, would go down toward the curve of the road and into the trench around the front of the house and down the hill. If five or six hundred gallons of gasoline should spill at the pumping station, it would not be enough to soak through the ground and get into a well 118 feet away. It would flow off and evaporate. If the ground was real sandy it might penetrate an inch, but it would soon be out of there. The soil there is sandy loam mixed with rock. If 550 gallons of gasoline had spilled, it would be absorbed by the earth and evaporation before it ever got into the well. Gasoline evaporates a great deal faster than oil. Gasoline is a thinner product than oil. Oil would penetrate a little deeper than gasoline because it would not evaporate as rapidly. Witness examined the ground where it was reported that the gasoline had soaked in. He could not find any indications of oil except around the edges of the pump house where the pipes go into the pump. There might be a natural drip. Witness took up soil five or ten feet away from there, and he could hardly find a trace of oil, and in about fifteen feet from the pump toward the well witness couldn't find anything at all. They dug down about twelve inches. They took samples from several points around the pump house. Witness took these tests to see if oil had entered the ground around there. The oil that had been dripping there for some time had penetrated six or eight inches. They didn't find anything there that amounted to anything—not even a trace. It was a physical impossibility for any oil or gasoline to have gotten over in that well from an earth stratum or from the surface. From witness' idea and experience in the gasoline business, he contended that no pure gasoline could have gotten over to that well through the strata of earth unless there was a pipe or something else. If it was wasted or poured

out there, it would flow off of the surface and down the ditch and evaporate.    Gasoline will not penetrate more than an inch or two on account of evaporation.    Coal oil would stay longer and penetrate deeper.    Witness, in answer to a question, stated that he didn't think it was possible for gasoline to have soaked down in the ground and to have struck a vein and flowed down into the well.    Witness was positive about that.

Another witness testified on behalf of the appellant that he was the agent in charge of the appellant's plant at Mena in 1919 and 1920, on the occasion that the pump broke. At that time they lost about ten gallons of gasoline. All that spilled was what was in the pumps after they took them apart to repack them. The gasoline hardly got the ground wet around there.   The pump was on a cement base, and it just barely ran off of the cement base.   On another occasion there were about twenty-five or fifty gallons of oil spilled around the pump.   It was not close to the time when the gasoline was wasted.   Witness was not there in 1918, the two years prior to July, 1920, when they claimed that gasoline was wasted.   But in July, 1920, witness knew that not exceeding ten gallons of gasoline were wasted when the pumps got out of fix.

Other witnesses also for the appellant testified that in 1920 a very small amount of gasoline escaped when the pumps were being repaired.

In rebuttal the appellee testified that in July, 1920, appellant's pump or some part of it burst and the natural flow of the gasoline from the tank to the pump was running out on the concrete at the pump and spattering off on the ground.    There was no one there to take charge of it, and appellee did not know how long it had been running.    The pump ran all night.    Part of the time there was no one there.    Appellee in passing saw that the door was shut and locked, and the pump was running. The next morning at the time the appellee saw the gasoline flowing around there was no one there.

In rebuttal a witness for the appellant in charge of the pump testified, denying that the pumps were left running at night without any one in charge; that they never pumped there at night.     The trial court visited the premises.

Upon substantially the above facts, the court found that the well was ruined by a flow of gasoline into it, and that the only source from which the gasoline could have flowed into the well was from appellant's tanks, and the only way in which it could have gone into the well was by penetrating and going down through some vein into the well.     The court found that the appellee had been damaged in the sum of $200, and rendered judgment in his favor for that sum, from which is this appeal.

The court erred in finding that appellee's well was ruined by the flow of gasoline into same and in giving the appellee damages as for a permanent destruction of his property.     The fact that on two occasions the gasoline flowed into appellee's well from the defects in appellant's pumping machinery, which rendered the water in the well at those times unfit for use, would hardly justify the court in finding as a matter of law that the well was permanently destroyed.     While the proof was to the effect that on the first occasion the appellee endeavored to remove the gasoline from his well, and was unable to do so, and on that occasion the party who was sent down into the well to dip out the water from the bottom was overcome by the fumes and had to desist, yet these facts are not undisputed proof of a permanent damage to the well.     The testimony on behalf of the appellant is undisputed that gasoline is a volatile liquid and would quickly evaporate in the air and be readily absorbed by the earth into or over which it flows.     Therefore, even though the testimony would have justified a finding that the well on the two occasions mentioned was rendered unfit for use by the overflow of gasoline from the appellant's pumps, there was no testimony to warrant a finding that this condition was permanent.     There was no testimony to warrant a finding that the defect in the ap-

pellant's pumps was a permanent condition. On the contrary, the testimony only tended to prove that the overflow of gasoline into the appellee's well took place on two occasions, and something like two years intervened between the first and second overflows.

Since, under the undisputed testimony, gasoline is a volatile liquid and one readily absorbed in the earth, and since it had flowed into the appellee's well only on two occasions, and since the defect in the appellant's pumping machinery was not such as to cause a constant flow of gasoline into appellee's well, it was obviously contrary to the laws of nature and the physical facts, as shown by the testimony, to conclude that the injury and damage to appellee's property were permanent and continuous, and to allow damages on the theory that the well was wholly destroyed. *Waters-Pierce Oil Co.* v. *Knisel,* 79 Ark. 608, 8 A. L. R. 798, N-2, and other cases in note to *Kelly* v. *Jones,* 8 A. L. R. 792. It appears from the testimony, as already stated, that the inherent physical nature and quality of gasoline is such that it would soon evaporate into the air or be absorbed in the ground; that it is a lighter liquid than water. Therefore, unless the source of its flow was perennial, it could not have permanently destroyed appellee's well, because when the water was drawn off the gasoline also would be drawn off. Hence the measure of appellee's damage was not as for a total destruction of his well and the cost of digging another one, as the learned trial judge found, but the expense which appellee would necessarily have to incur in order to restore his well to its former use. We are convinced that the testimony did not justify the court in finding as a matter of fact that appellee's well was wholly destroyed, and in declaring as a matter of law that he was entitled to damages as for a permanent and total destruction of his property.

The judgment is therefore reversed, and the cause remanded for a new trial.