FALKENSTERN, Appellant, vs. TOWN OF GREENFIELD, Respondent.

*February 3—February 21, 1911.*

*Appeal: Affirmance: Verdict directed on wrong ground: Evidence: Weight: Testimony at variance with natural laws: Waters: Injury from overflow: Defective bridge.*

1. A judgment upon a directed verdict, though not sustainable upon the precise ground upon which the trial court rested it, will be affirmed if it appears from the record that the evidence would not have warranted a different verdict.
2. Testimony of a witness, even when uncontradicted by any instrument or by other testimony, may be rejected if, in the light of physical situations and matters of common knowledge, it is at variance with the laws of nature.
3. In an action by a millowner against a town for injury to his property by the overflow of a creek, alleged to have been caused by the fact that defendant in building a new bridge across the stream had narrowed the openings which formerly existed for the passage of the water, it is *held*, in view of the physical situation and the laws of nature, that the jury would not have been warranted in finding from the evidence that the change in the bridge was an efficient cause in producing the injury.

    TIMLIN, J., dissents in part.

APPEAL from a judgment of the circuit court for Sauk county: CHESTER A. FOWLER, Judge. *Affirmed.*

Action to recover damages for creating and maintaining a nuisance to plaintiff's damage.

The claim of the plaintiff was that the town constructed a bridge across a creek below his mill property thereon, leaving an insufficient opening for the free passage of water as formerly, whereby water backed up, overflowed the banks of the stream and carried off some of his buildings and otherwise injured his property.

The claim of defendant was that although plaintiff's property was damaged by flood water at the time alleged, the injury was caused by his having maintained his dam in such an

insecure condition that it had frequently been washed out, depositing a large amount of *débris* in the creek bed between the dam and the bridge, thus interfering with and obstructing the flow of water to and past the bridge; that he knowingly maintained the dam in such insecure condition, and that the damage complained of was caused thereby.

The evidence was to this effect: Plaintiff owned a mill property on a small creek some 250 feet above the bridge in question. The mill and mill-race were on the left bank of the stream. The mill-dam on the left side was composed of a long solid bank of earth. At the right extending toward the right bank there was an old and a new spillway, the aggregate width being about ninety feet. Further to the right, forming the right wing nearly 100 feet long, there was a bank composed of brush, stones, and earth.

The water formerly left the spillway in a broad, thin stream, but by filling up of the creek by *débris* cast therein from time to time, by washings out of the dam, the waterway was caused to divide about forty feet from the foot of the dam, so that part of the water flowed to the right in a channel which narrowed at a point a short distance from the dam to a width of about sixteen feet and part flowed to the left in a channel which narrowed at a point about 100 feet from the dam to a width of about ten feet. The division between the two channels was about fifty feet. They came together about 240 feet from the dam and the way for the water was then under the bridge through two culvert openings having an aggregate width of twelve feet on the bottom, a height of five and one-half feet, and a cross-sectional area of seventy-two feet.

There was a large water-shed above the dam. The territory was so large that in heavy rains there was danger of the dam being carried out. Such occurrences had happened several times before the occasion in question. There were gates in the dam and splash boards thereon, which were removed

when necessary to prevent undue pressure on account of flood water. The removal of the splash boards on occasion of an existing freshet would cause a large quantity of water to be cast into the territory between the dam and the bridge, as the pond was quite large.

The right bank of the creek between the dam and the bridge raised about two feet above the water, ordinarily, when the mill was not in operation. The surface of the ground on that side back from forty to one hundred feet or so was about on the same level, then it sloped upward at an angle of some forty-five degrees for a considerable distance. The situation was such that from five to ten acres, or perhaps a little more of surface drained into the creek on the right side above the bridge and below the dam. The filled-in territory aforesaid was nearly as high as the banks of the creek. The left bank was about the height of the right bank. It was so low that a rise of water from the ordinary level of two feet or such a matter would cause the same to go out of the creek bed on either side. Near the foot of the left wing and around to the mill, a distance of about 130 feet the surface of the ground was somewhat higher than from a little further down to the highway and further on down the creek valley. The mill-race extended from a point in the left wing of the dam about 140 feet from the left side of the spillway nearly parallel with the downward course of the stream for a distance of about 140 feet, then turned to the right to serve the mill. The tail-race extended from the mill down the valley about 100 feet to and through a culvert over the highway and then on down the valley to an intersection with the natural creek bed. The highway was about parallel with the dam. The approach to the bridge on the right of the creek was raised a little.

On the left side of the roadway down to the creek there was a deep, wide gully made by action of the surface water. Down this gully on occasions of heavy rain storms a large

quantity of water flowed and into the creek just above the bridge. The fall from the foot of the dam to the bridge was about three feet. The territory bounded by the dam, the creek, the flume, the tail-race, and the highway was 150 feet wide near the dam, 250 feet on the creek line, and 240 feet on the side bounded by the highway. The highway from near the bridge to the tail-race was on the natural surface of the ground. The ground within the boundaries stated from near the foot of the left wing of the dam and the bank of the creek, which points were about two feet above the ordinary surface of the water in the creek, sloped a little down towards the highway so that a rise of water of about two feet would cause it to overflow the filled-in territory aforesaid and at the same time overflow the bank of the creek on the left for a distance above the highway of some 200 feet so as to cover a large part of the territory between the creek and the tail-race and pass over the highway and down the valley in a still broader sheet. The spread at the highway would be upwards of 200 feet wide in case of there being sufficient water to cover such area. The lay of the surface was favorable thereto.

Plaintiff's mill was located about midway between the left wing of the dam and the highway and about 130 feet from the left channel of the creek. His granary was located about twenty-five feet from the mill towards the creek and a little above the general level of the creek bank. His barn was below the highway, about twelve feet from the center line thereof and on a level with the general surface of the valley, as above indicated, and in the natural course of water overflowing from the creek between the bridge and the dam.

The bridge was constructed in 1903 to replace an old one. The latter had an opening for the passage of the creek about one half wider and of different form than the new one and sufficient to allow the full capacity of the creek to flow through it at all times. The form of the new construction

was not as suitable as the old one to accommodate a flow of water carrying floatable material liable to lodge and create obstructions. The old bridge narrowed the natural banks considerably and the new one about one third more. Formerly the water could reach the vicinity of the bridge flowing in a stream of considerable width. By reason of filling up by washing out of the dam, from time to time, that was narrowed to the two channels, aggregating about twenty-six feet wide. When the bridge was in progress of construction plaintiff protested to those doing the work that the openings were too small. After the new structure was put in, in case of a heavy rain, the water flowing into the creek on the left bank above the bridge would meet the water flowing from the dam and cause a rise and whirlpool motion of the water reaching up to the dam.

On the night of July 4, 1907, there was a heavy storm. Plaintiff was on the dam the greater part of the night. The water came down into the creek from the steep hillsides reaching for a distance of some twelve miles above the dam. It also came down in a large quantity from the territory on the right bank of the creek between the dam and bridge, particularly down the aforesaid gully on the side of the highway. From time to time as the storm progressed plaintiff took the splash boards off the dam. The water came down the gully, meeting the water of the creek, causing a whirling and backing up of the water to the dam. About 12 or 1 o'clock the barn collapsed from the action of the water and washed away. Later, as plaintiff testified, the dam went out. Sometime during the night the granary was caused to tip over by action of the water and other injuries to plaintiff's property occurred. No damage was caused to plaintiff's property by insufficiency of the culvert till the occasion in question.

At the close of the evidence the court directed a verdict in favor of the defendant upon the ground that the evidence showed the damage to plaintiff's buildings to have occurred before the dam broke and by reason of the natural freshet

flow of the stream, and that such flow below the dam and above the bridge was so obstructed by the filling up caused by plaintiff after the building of the bridge; and that such obstruction efficiently contributed to cause the overflow and the damage. Judgment was rendered accordingly.

For the appellant there was a brief by *Bentley & Kelley,* and oral argument by *F. R. Bentley.*

For the respondent there was a brief by *Daniel Ruggles* and *John A. Aylward,* and oral argument by *Mr. Ruggles.*

MARSHALL, J. Whether the trial court was warranted in directing a verdict in favor of respondent upon the ground that the evidence conclusively showed negligent maintenance by appellant of the dam to have efficiently contributed to produce the injury complained of, in that it resulted in the natural bed of the creek between the dam and the bridge being filled up by *débris* cast there upon occasions of the dam being washed out, and that such filling obstructed the flow of water to and through the openings under the bridge, materially adding to the danger of water overflowing the creek banks above the bridge and reaching appellant's improvements with damaging effect, does not appear very satisfactorily. It is doubtful, at least, whether the judgment could be sustained upon the precise ground the trial court rested it, but there is a much broader one in favor of respondent which seems to be insurmountable.

The claim of appellant that the natural flow of the stream below the dam, augmented by water which came into the creek from the few acres of surface on the right bank, was so obstructed at the bridge as to overflow the creek bank on the left side in such quantity as to form a deep powerful torrent reaching to and engulfing the barn and granary, located as indicated in the statement, overturning the latter and causing the former to collapse and float away,—is too incredible for belief.

The story told by appellant that the occurrence to the barn

took place long before the dam went out taxes our credulity at least to the limit. There is a boundary beyond which a witness cannot go and have his evidence entitled to any weight in determining the truth as to a controverted question of fact. It is a mistake to think everything which a witness may say under oath, however preposterous, is proof. The story of a witness on the stand, uncontradicted by any instrument or statement from the mouth of any other witness, may, in the light of physical situations and matters of common knowledge, convict him of at least being conclusively mistaken. In suggesting this we do not intend to go so far as to decide that the appellant in this case told a false story as to the time when the barn floated off with reference to when the dam went out. For the purpose of the case, it may be assumed that the story, however incredible, is a true one and the result would be the same as we view the record.

The laws of nature cannot be turned aside by the story of any witness or number of them. Water will flow down hill and in all such directions till it comes to a level, and a few inches of disturbance of the level within such distances as are material to this case, that is from point to point in the territory bounded by the creek, the dam, the mill flume and race, and the highway; will inevitably, in case of the volume being large, cause a rapid, forceful flow. The lay of the ground was such that before water in the downward course on the left side of the creek was sufficient to reach and do the damage to the buildings complained of, it must have been several feet deep and in a stream reaching from the bank of the creek toward the flume over 100 feet and below the mill, covering practically the whole width between the creek and the tail-race, a distance of nearly 200 feet. It cannot be that water flowing into the creek just above the bridge formed any material part of such a great body. It must have come from above the dam, primarily; territory hundreds of times greater in area than that served by the inflow to the creek between the dam and the bridge.

The evidence from the mouths of witnesses is that the rain storm was not extraordinary, yet, by undisputed evidence, for the four years the bridge had been maintained, as at the time of the occurrence in question, it had not caused any injury to appellant's property. That there were some hard storms in the meantime the evidence amply shows. Therefore, assuming that the witnesses were correct in saying that there was nothing extraordinary about the storm in question, certainly some other extraordinary occurrence must have taken place to have caused such an immense body of water to come from the territory above the line of the dam as was flowing down the valley outside the banks of the creek at the time the barn floated off. Such an occurrence is not consistent with the direct evidence, except that appellant took off the splash boards from his dam before the barn moved off. Of course, in view of the size of the flowage above the dam and the storm, the removal of the splash boards must have greatly augmented the natural freshet flow of the stream; and yet it is hard to believe it could have done so sufficiently to have produced such a deep, broad stream as that mentioned.

The only complaint about the bridge is that the openings were decreased in capacity by a narrowing of about one third. As the opening practically was unobstructed the morning after the dam went out, it must have been so during the night in question. There was nothing in the changed characteristics of the bridge, from the time when it was confessed that it did not obstruct the stream, to account for the great flood passing down the highway, except narrowing of the opening about six feet. That such narrowing could not have caused the flood is plain beyond room for reasonable controversy. If such narrowing had caused water to pass down on the left bank across the highway it could not have been sufficient, under the circumstances, to create a stream of any great depth. If the whole opening in the bridge, as it formerly existed, had been closed up so as to compel the entire ordinary freshet flow of the stream to pass down the valley on the left bank, the spread

would have been so great that no such broad, deep flow would have occurred as must have existed at the time the barn collapsed and floated off and the granary toppled over.

So irrespective of whether the filling up of the channel below the dam by *débris* from the dam previous to the occurrence in question, proximately, to any extent, caused the damages complained of, it is very plain that the jury would not have been warranted in finding from the evidence to a reasonable certainty that the change in the bridge had anything substantial to do with the matter.

*By the Court.*—Judgment affirmed.

TIMLIN, J. I concur in the result but not in all that is said in the opinion. I have not that confidence in my knowledge of physical situations as established by oral evidence nor in my grasp of "matters of common knowledge" which would enable me to thereby impeach and discredit a witness. I may be pardoned for doubting whether others have such power.

Testimony which is demonstrably false may no doubt be rejected, as if one should testify that the square root of 64 was 9, or that the sum of the interior angles of a triangle was greater than two right angles. Testimony might also in some cases be rejected which was so much in conflict with known natural laws that the act or event testified to would be a miracle. But not every one would agree with this last proposition. In every case, however, where the physical situation is itself derived or imagined from oral narrative, even if the latter be uncontroverted, and in all that vast number of instances where common knowledge may possibly be only common error, there should be no such rule for weighing testimony.