HAGINS et al. v. WILSON et al. (No. 2251.)

(Court of Civil Appeals of Texas. Amarillo. March 26, 1924. Rehearing Denied May 21, 1924.)

1. **Trial** ⬥⇒352(1)—**Court held to have erred in framing special issues.**

In action to restrain maintenance of ditch, levee, and embankment throwing flood waters on plaintiffs' lands, thereby constituting a continuing injury, it was error for court, in framing special issues, to confine them to a finding whether lands had been injured, and not permitting jury to find whether lands would be damaged in future.

2. **Appeal and error** ⬥⇒231(1)—**Error in framing special issues held sufficiently called to court's attention.**

Where appellant objected to special issues and pointed out particular defect complained of, and suggested what would be correct issue, trial court's attention was sufficiently called to error to entitle appellant to urge it on appeal, especially where he submitted special issues curing defect, in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 1985.

---

⬥⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**3. Trial** ☞194(20) — **Instruction held upon weight of evidence as tending to impress jury with idea that damages were impossible of estimation.**

Instruction that jury should not undertake to estimate and assess any damage based upon surmise and speculation in answer to certain special issues *held* on weight of evidence as tending to impress jury with idea that court thought damages, if any, were practically impossible of estimation.

**4. Damages** ☞6 — **Plaintiff held entitled to have jury fix damages where uncertain in amount.**

Rule against uncertain or contingent damages applies only to such damages as are not certain results of breach, and not to such as are certain results or uncertain in amount, and in latter case plaintiff is entitled to have amount fixed by jury in exercise of sound discretion.

**5. Evidence** ☞6 — **Legitimate inference more flood water would pass over lower side of stream.**

Where land on one side of a stream is 18 inches lower than land on other side it is a legitimate inference that, in absence of ditch and embankment, more flood water, in seeking its level, would pass over lower side.

**6. Waters and water courses** ☞179(4)—**Evidence held to show ditch and embankment constructed to divert flood waters.**

In suit to enjoin diversion of flood waters and recover damages, conclusion *held* inevitable from evidence that ditch and embankment were constructed to divert flood waters of creek from slough running through defendants' land, so that it would flow upon lands of plaintiff on other side of creek.

**7. Evidence** ☞18—**Court knows that dam one half width on one side of stream doubles volume of flood waters on other side.**

Court knows that when a water course which is at times flooded 700 yards wide has one-half of its width obstructed by a dam it necessarily doubles volume of waters which flows over unobstructed half.

**8. Evidence** ☞6—**Judicial notice taken of unquestioned laws of nature.**

Courts take judicial notice of familiar and unquestioned laws of nature and existence of facts which happen according to constant course of nature as well as of primary and commonly known laws of physics, and know that water runs down hill.

**9. Waters and water courses** ☞171(2)—**Diversion of flood waters held wrongful.**

Obstruction in stream on land of lower owner and refusal of such owner to permit its removal did not entitle upper owner to right to construct dam and levee to prevent overflow resulting in diversion of flood waters upon land of a third party across stream, in view of Vernon's Ann. Civ. St. Supp. 1918, art. 5011t.

**10. Waters and water courses** ☞171(3)—**Diversion of flood waters may be enjoined as to codefendant defaulting.**

In action against two landowners maintaining dam and ditch to enjoin diversion of flood waters, plaintiff was entitled to an injunction as against one not answering and defaulting, defendants being jointly and severally liable.

**11. Waters and water courses'** ☞171(3) — **Wrongdoer diverting flood waters may not transfer liability.**

One of two landowners constructing ditch and dam resulting in diversion of flood waters upon land of a third party could not lawfully assign to his joint tort-feasor right to injure third party, nor transfer his liability for a wrong which other might do acting under a contract of indemnity.

**12. Contracts** ☞105—**Contract contemplating violation of statute void.**

A contract giving privilege of extending embankment over land by another landowner in violation of statute was void.

**13. Waters and water courses** ☞171(3) — **Landowners diverting flood waters jointly and severally liable.**

Adjoining landowners who constructed dam and ditch on their land so as to divert waters onto lands of another were both jointly and severally liable for maintaining a nuisance.

**14. Parties** ☞40(1)—**Joint tort-feasor has no right to intervene.**

A joint tort-feasor has no right to intervene in a suit against other person participating in wrong.

**15. Appeal and error** ☞1060(1) — **Trial** ☞124—**Argument of counsel held improper but not prejudicial.**

Argument of counsel that codefendant ought to have been made plaintiff in suit, and was "in cahoots" with plaintiff, was improper, but not reversible error.

**16. Parties** ☞35—**One declining to be a plaintiff may be joined as defendant.**

Where one who should properly be a plaintiff declines to join in that capacity he may be joined as a defendant.

**17. Appeal and error** ☞1069(1) — **Reversal where jury receives evidence not presented during trial if effect doubtful.**

Where jury receives evidence not presented during trial it requires a reversal if appellate court feels doubtful that it even in part affected any juror's finding.

On Motion for Rehearing.

**18. Waters and water courses** ☞118—**Statute against diversion of surface waters declaratory of common law.**

Vernon's Ann. Civ. St. Supp. 1918, art. 5011t, against diversion of surface waters, is merely declaratory of common-law rights and liabilities of riparian owners.

**19. Evidence** ☞6 — **Regardless of testimony court takes judicial notice of plain physical facts and natural laws.**

Regardless of testimony of witnesses and verdicts of juries to contrary, courts must take judicial knowledge of plain physical facts and natural laws.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**20. Waters and water courses ⊜⇒115—"Surface waters" within statute prohibiting diversion includes flood waters.**

"Surface waters" within Vernon's Ann. Civ. St. Supp. 1918, art. 5011t, prohibiting diversion of surface waters, includes flood waters of a creek or such waters as during rains flow through any gully, slough, ditch, or any well-defined natural drainage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Surface Water.]

Boyce, J., dissenting.

Appeal from District Court, Dickens County; J. H. Milam, Judge.

Suit by A. J. Hagins and another against W. T. Wilson and another. Judgment' for defendants, and plaintiffs appeal. Reversed and remanded.

B. G. Worswick, of Dickens, and Stinson, Coombes & Brooks, of Abilene, for appellants. W. D. Wilson, of Spur, and Underwood, Jackson & Johnson, of Amarillo, for appellees.

HALL, C. J. A. J. and B. J. Hagins, appellants, filed this suit against W. T. Wilson and Walter Carlisle, to enjoin them from diverting the flood waters of Duck creek, and to recover damages resulting to plaintiffs' lands by reason of such diversion. A trial before a jury resulted in a verdict for the defendants. Duck creek is not a perennial stream, but during freshets overflows the valley through which it runs, inundating the lands belonging to the several parties to the suit. The territory in controversy is the southeast quarter of section 168 in Dickens county, the southwest quarter of section 167, lying immediately east of section 168, the northeast quarter of section 153, lying immediately south of section 168, and the northwest quarter of section 154, lying immediately east of 153. The general direction of Duck creek is from northwest to southeast through these quarter sections of land. The appellee Carlisle owns the north half of the southeast quarter of section 168, W. T. Wilson owns the south half of said southeast quarter and the northeast quarter and the southeast quarter of section 153. The last two mentioned tracts are both on the west side of the channel of Duck creek. B. J. Hagins owns the southwest quarter of section 167 and A. J. Hagins owns the southwest quarter and the northwest quarter of section 154. Duck creek enters the lands described near the northwest corner of the southeast quarter of section 168, flowing through the land owned by Carlisle in a southeasterly direction for about 300 yards, curving to the east and northeast into the northeast quarter of said section 168, near the center of the south boundary line of said northeast quarter. The channel continues across said

northeast quarter, its general direction being a semicircle northeast, east, and southeast, passing out near the southeast corner of said northeast quarter; thence across the northeast corner of the southeast quarter of section 168 into the southwest quarter of section 167, owned by plaintiff B. J. Hagins; thence continuing southeast, south, and west, running back into the southeast quarter of section 168, about 250 yards north of its southeast corner, passing across a point which is the common corner of sections 168, 167, 153 and 154; thence meandering southeast, south, and southwest across the west half of section 154, owned by the plaintiff A. J. Hagins. It is alleged that there is a slough or depression which comes out of Duck creek in the north half of the southeast quarter of section 168 on Carlisle's land, which runs south, or a little east of south, across the said southeast quarter of section 168, and on across the east half of section 153, passing out near its southeast corner, and a short distance below said corner leads back into Duck creek, as shown by the map.

Plaintiff alleges that there is an actual flow of waters during wet seasons down the bed of Duck creek, which traverses said lands, and a natural flow of water through said slough; that when the water is high in Duck creek the flood waters, flow through said slough and across the land of the defendants Carlisle and Wilson; that the defendants have opened a ditch from a point where said' slough leaves the bed of the creek on Carlisle's land, which extends in a southeasterly direction to where the bed of the creek crosses near the common corner of the above-described quarter sections; that in opening said creek the soil was thrown on the south or east side of said ditch, resulting in an embankment or a levee, which prevents the flood waters from flowing through said slough, and has resulted in diverting the natural flow of all flood waters from said slough through and across defendant's lands to the east of the channel of said creek; that after the construction of said embankment the same was broken by flood waters which flowed across the lands of the defendants as before the construction of the embankment, but that the defendant Wilson had repaired said embankment, which caused the overflow to again run across plaintiffs' lands, to plaintiffs' damage in the sum of $500.

The defendant Carlisle defaulted. The defendant Wilson denied the existence of any slough, as described in the plaintiffs' petition, and denied that there was any natural flow of flood waters through any such slough as alleged by plaintiffs. He alleged that said embankment and ditch were not constructed on the lands of the defendants for the purpose of diverting flood waters; that it did not have the effect to cause the diverted flood, waters to flow over the lands of the plaintiffs.

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

It is further alleged that the situation of the surveys to the north of the land involved in the suit and the course of the waters following Duck creek were such that overflow water left the creek before it reached the lands in controversy and overflowed plaintiffs' premises; that on September 8, 1917, there was an unprecedented rainfall in the watershed of Dockum creek, which was a tributary of Duck creek, which watershed was several miles northwest of the lands in controversy, which caused Duck creek to overflow its banks at a point about the center of the west half of the north half of the southeast quarter of the survey 168, owned by the defendant Carlisle, at the point where Duck creek turns and run into a northeasterly direction washing off a part of the top of the bank of Duck creek at said place, and flowing in a southeasterly direction over the southeast quarter of survey 168, and the east half of survey 153, and clogged and obstructed Duck creek below that point; that the defendant Carlisle failed and refused to remove the drifts and obstructions caused by said unprecedented rainfall, and in consequence thereof, in the month of June, 1920, during heavy rainfall upon the watershed of Duck creek, the channel became further obstructed and was completely closed, causing the waters which ordinarily flowed down such original channel to be turned therefrom and flow over the south bank of said creek at said point, and overflow the lands of the defendants to the south thereof, entering the creek again lower down. He further alleged that he offered his codefendant, Carlisle, if the latter would permit the removal of said obstruction and the restoration of the south bank of said creek to its previous condition, that he (Wilson) would bear all the expense of restoring the bank of said creek to its original condition, which offer Carlisle refused; that in the exercise of his lawful rights and in order to avoid the threatened change of a channel of the creek, without intending to divert any waters from their natural course, he constructed the ditch and embankment on his own land, as described in plaintiffs' petition. He alleged that there was another excessive rainfall in April, 1922, which caused a threatened change in the course of said creek on the west bank thereof where it enters the east half of survey 153, and just above where it crosses into survey 154, and that the overflow cut away the top of the bank for a distance of about 70 feet; that after the water subsided he constructed a small levee along the west side for the purpose of restoring the bank to its original height and condition before said overflow.

The controversy was submitted to the jury, who found as follows:

"(1) The defendants did not divert the flood waters of Duck creek and cause them to flow onto and over the lands of the plaintiff A. J. Hagins.

"(2) Defendants did not divert the waters of Duck creek, causing them to flow onto and over the lands of plaintiff B. J. Hagins."

The third and fourth issues, as follows, were answered in the negative:

"(3) If you find that the defendants did divert the flood waters of Duck creek and thereby caused them to flow onto and over the lands of plaintiff A. J. Hagins, was plaintiff A. J. Hagins' land damaged thereby?

"(4) If you find that the defendants did divert the flood waters of Duck creek, thereby causing them to flow onto and over the land of plaintiff B. J. Hagins, was plaintiff B. J. Hagins' land damaged thereby?"

By issues Nos. 5 and 6 the jury were requested to find to what extent the lands of A. J. and B. J. Hagins were damaged, to both of which issues the jury answered, "None."

[1, 2] The first proposition which we will consider is that, where the prayer is for an injunction to restrain defendants from maintaining a ditch, levee, and embankment, thereby throwing flood waters from their natural course onto the lands of plaintiffs, thereby constituting a continuing injury and damage to such lands, it was error for the court, in framing special issues, to confine them to a finding whether the lands had been injured, and in not so framing the issues as to permit the jury to find whether the lands would be injured and damaged in the future by such diversion. The appellant objected to the third and fourth issues comprehended under this proposition, and in his objections pointed out the particular defect complained of in the proposition, and further suggested what would be a correct issue. Under the case of Foster v. Atlir (Tex. Com. App.) 215 S. W. 955, we think this was sufficient to call the court's attention to the error and entitle appellant to urge it here. Appellant, however, went further than the objections stated, and submitted two special issues, which cured the defect. This was sufficient under article 1985, V. S. C. S., to have required the court to correct the errors. In view of the fact that appellant was seeking a mandatory injunction requiring the appellees to remove the embankment, the issue of prospective future injury to his land was a material issue.

[3-5] The court gave the appellee's requested instruction, to the effect that, if the jury believed that the overflows of Duck creek, which had previously occurred, were such that plaintiffs' lands, or any part thereof, would have been inundated and damaged, irrespective of the presence of the ditch and embankment, then, even if the jury believed further that the presence of the ditch and embankment diverted additional water over plaintiffs' land sufficient to cause additional

damage to plaintiff in excess of that which would have resulted without such ditch and embankment, and if the evidence did not show or enable the jury to determine what portion of the damage would be proximately caused by the presence of such ditch and embankment, the jury should not undertake to estimate and assess any damage based upon surmise and speculation in answer to special issues Nos. 5 and 6 in the court's charge, or either of said issues. This charge is manifestly incorrect, and we think was upon the weight of the evidence, as it tended to impress the jury with the idea that the court thought the damages, if any, were practically ·impossible of estimation.

"The rule against the recovery of uncertain damages generally has been directed against uncertainty as to cause rather than uncertainty as to measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the breach, and not to such as are the certain results, but uncertain in amount. In many cases, although substantial damages are established, their amount is, in so far as susceptible of pecuniary admeasurement, either entirely uncertain or extremely difficult of ascertainment. In such cases plaintiff is not denied all right of recovery, and the amount is fixed by the jury in the exercise of a sound discretion under proper instructions from the court. This is particularly true of torts. * * * So in cases of tort, where there are elements of certainty as to a part only of the damages which have resulted, leaving it apparent that there are actual damages beyond what can be thus accurately measured, plaintiffs' recovery is not limited to so much only as can be measured with certainty." 17 C. J. pp. 756–758; Payne v. Mt. Franklin Fuel & Feed Co. (Tex. Civ. App.) 234 S. W. 595, 600; H. & T. C. Ry. Co. v. Hill, 63 Tex. 385, 51 Am. Rep. 642; American Freehold Land Mortgage Co. v. Brown, 54 Tex. Civ. App. 448, 118 S. W. 1106.

Practically every issue in the case is sharply contested. However, we find in the record a blueprint map by Geo. M. Williams, shown to be a civil engineer, who since the embankment was constructed took the levels of Duck creek valley, from one hill to the other, east and west, on a line crossing the creek where the lower end of the ditch enters the channel, near the common point of the-four quarter sections of land described above. The correctness of this map is not questioned, and it appears that the appellee Wilson's premises, lying west of the creek bed, are on an average more than 18 inches lower than the average elevation of the appellant's lands lying east of said common point. The legitimate inference from this uncontested physical fact is that, in the absence of the ditch and embankment, more flood water, in seeking its level, would pass over the appellees' land than over the appellants'. The record shows that the ditch and levee are 1,842 feet long, and extend from near the hill on the west side of the

valley in a southeasterly direction to near the bed of the creek; thence south and parallel with the creek about 150 feet further. All of the maps show that the bed of the creek, where the lower end of the ditch. empties into it, is near the center of the valley. There is evidence showing that at one time since its construction the embankment has been washed away in places, and that the appellant rebuilt it at the breaches, and that during subsequent freshets deep holes have been washed out by the action of the water in appellant's land. One witness testified that he had seen the entire valley under water, so deep in places that it reached the saddle stirrups of one riding across on horseback. Whether or not all of this testimony is true, we think the above charge is upon the weight of the evidence, and tended to attack the credibility of the witnesses when it came on to be considered by the jury.

[6-9] The next contention is that the court should have peremptorily instructed the jury to find that the result of the ditch and embankment was to divert flood water and increase the flow upon appellants' premises, since appellees' act in constructing the dam was in violation of law and of Vernon's Ann. Civ. St. Supp. 1918, art. 5011t. This is in the act of May 29, 1915 (Acts First Called Session 34th Legislature, c. 7) entitled:

"An act to make it unlawful for any person, firm or private corporation in this state to divert the natural flow of the surface waters in this state or to permit such a diversion to continue after the passage of this act * * * in such a manner as to damage the property of another; and to provide that in all such cases the injured party shall have remedies, both in law and equity, including damages occasioned thereby, and declaring an emergency."

While the act has been incorporated in the 1918 Supplement to V. S. C. S. in title 73, c. 1, it was no part of the former laws relating to irrigation and other water rights. There is a want of harmony in the various jurisdictions in declaring the rules of civil law and common law which govern the water rights and liabilities of riparian owners. The case of Fort Worth Improvement District No. 1 v. City of Fort Worth, 106 Tex. 155, 158 S. W. 167, 48 L. R. A. (N. S.) 994, arose under title 47, Revised Statutes of 1911, but in a general discussion of the question now under consideration the Supreme Court in that case said:

"As between individual riparian owners, it is an established principle that one may make no use of the stream that will result in the injury of the other, and may for his greater convenience or benefit erect no embankment or obstruction which in times of ordinary flood will cause its waters to overflow and injure the lands of an opposite proprietor. This is but the application of the doctrine embodied in the ancient maxim, that one must enjoy his own rights so as not to injure those of another; or, as elsewhere well expressed, 'The necessities

of one man's business cannot be made the standard of another man's rights in that which belongs equally to both,' which, of course, includes that in which both have an equal usufructuary interest, the extent of the right of riparian owners in the waters of a stream. It is but the rule of universal right and common justice, and stands in need of no sanction to give it authoritative force. The question, however, is thoroughly treated in 2 Farnham on Waters and Water Rights, § 530, in which it is said: 'The owner of one bank may erect structures to protect his bank in its original condition but he cannot erect embankments in the stream for the purpose of reclaiming land, the effect of which is to destroy the opposite bank. Nor can he erect structures for the protection of his own banks in such a way as to change the natural flow of the water, and cast it upon his neighbor's land. It has been held that one owner might raise his bank so as to confine the water to the channel in times of flood but in such cases the limitation is made that in so doing he must not cause injury to the lands or property of other persons. The limitation goes a long distance towards destroying the rule. A basin of a given size is necessary to hold the water which naturally belongs to a water course, and if it is cut off on one side it must be enlarged on the other; so that the raising of one of the banks preventing the water from occupying the flood channel on that side necessitates its occupying proportionately more space on the opposite side and the increase of the water there must, of necessity, cause injury to the landowner; and the act is a direct violation of the maxim, 'Sic utere tuo ut alienum non lædas,' in that, for the purpose of relieving his own property of a burden, the owner merely transfers it to his neighbor. Some of the cases have made the question of liability depend upon whether or not the current of the stream was changed by raising the banks on one side, holding that there was liability in case it was. But the broader rule that the owner of one bank cannot turn water onto his opposite neighbor, is very ancient. Vattel states that no embankment can be raised the tendency of which is to throw the water upon the opposite bank. And that is the rule which has been adhered to, more or less strictly, by the current of authority. It is also the rule of justice and right. If, for the protection of property and the development of the country, it is necessary to confine the waters to the channel of the stream, it can easily be done under the governmental power to make needed improvements by raising banks on both sides of the stream alike; and one owner should not be permitted to take the matter into his own hands, and thereby injure or destroy the property of his neighbor. This rule prevents the construction of a solid embankment along the stream by a railroad company the effect if which is to cast the water in greater quantities onto the opposite shore.' "

After citing numerous authorities sustaining the rule, including Sullivan v. Dooley, 31 Tex. Civ. App. 589, 73 S. W. 82, Phillips, Justice, who delivered the opinion of the Supreme Court, proceeds to discuss the application of the principles laid down to the provisions of title 83 of the Statutes of 1911. The above-mentioned article 5011t, seems to have been enacted as a legislative declaration of the above-stated principles, since it provides as follows:

"That it shall hereafter be unlawful for any person, firm or private corporation to divert natural flow of the surface water in this state or to permit a diversion thereof caused by him to continue after the passage of this act, or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies in both law and equity, including damages occasioned thereby, provided that the passage of this act shall in no way affect the construction and maintenance of levees and other improvements for the purpose of controlling floods, overflows and freshets in the rivers, creeks and streams, nor the construction of canals for the purpose of conveying waters for irrigation; and provided further that nothing in this act shall be so construed as to authorize or give authority to persons or corporations owing or constructing canals for irrigation or other purposes, to construct or maintain any canal, lateral canal or ditch in such manner as to obstruct any river, creek, bayou, gulley, slough, ditch or other well-defined natural drainage."

This court, in Bevers et al. v. Hughes et al., 195 S. W. 651, construed this act in a case somewhat similar to the instant case, and held that the above-quoted act modified the rule with reference to surface waters as it existed in this state prior to its enactment, saying:

"By this act, the diversion of surface water from its natural flow may not be done in such manner as to damage the property of another. Under this statute, if it was not the rule previous thereto, the owner of the dominant estate may not, to the injury of the subservient estate, divert the water from its course which it would have naturally followed and discharge it through new artificial channels, or cause it to discharge upon the lower estate at a point which would not have been its natural destination."

According to appellant's contention, flood waters, during freshets, leaving the channel of Duck creek, on the premises of Carlisle, would have flowed south, across appellees' premises. That there is a depression there is testified to by numerous witnesses, and is admitted by the appellee himself, and it is shown that at a time previous to the construction of the embankment in question there were lakes of water in such depression where cattle were accustomed to drink. In the case of Wilkerson v. Garrett (Tex. Civ. App.) 229 S. W. 666, Fly, C. J., considers the right of a dominant owner by a ditch to discharge flood waters upon his neighbors. Construing this statute, he quotes from a former decision of the San Antonio Court of Appeals (Gembler v. Echterhoff, 57 S. W. 313), wherein it is said he may be permitted to turn

surface water from his own land by embankment or improvement, but he cannot obtain possession of the surface water, etc., and then says:

"That was said when the common-law rule prevailed and before the statute on the subject was enacted. It has been often cited and approved"—naming six cases.

Judge Fly says:

"It has never been the law in this state that a landowner had the right to concentrate surface water in artificial channels and cause it to flow on adjoining property and damage it."

Judge Fly's discussion of the doctrine is so clear and is sustained by such copious citation of authorities that we will not undertake to reproduce it. It is in accord with the Fort Worth Improvement District Case and the case of Sullivan v. Dooley, cited by the Supreme Court in the Fort Worth Case, as well as the Bevers decision, supra, by this court, and it may be safely stated that the right of the dominant owner to divert surface water from his own land to the injury of his neighbor is well settled. Hester v. McAdams (Tex. Civ. App.) 203 S. W. 121. It appears that Duck creek flows through a valley in which the soil is mostly loose sand. The channel of the creek averages about 40 feet in width, and is of an average depth of about 6 feet. While it is not a perennial stream, it apparently has a vast watershed, since numerous witnesses have testified that during seasons of rain they have seen the water as wide as 700 yards at the place where the embankment and ditch in question reach the bed of the creek. If appellee's purpose in digging a ditch, throwing the soil out of it on the lower side thereof, strengthening and re-enforcing it with rocks, brush, willow trees, hog wire, railroad ties, and solid plank fencing anchored to "dead men" in the bed of the creek by strong wire, was not to protect his land lying south and west of it from flood waters which would otherwise have overflowed it, it is difficult to understand why such an expensive and extensive work was undertaken. The embankment is over 2,000 yards long, and from the top of it to the bottom of the ditch is estimated to be an average of 8 feet. Appellant says its initial cost was over $800. Despite the findings of the jury to the contrary, the conclusion is inevitable from the very existence of the ditch and embankment that they are there to divert the flood waters of Duck creek from the slough which runs south through appellant's land. Furthermore, despite the finding of the jury to the contrary, we know that when a water course which is at times flooded 700 yards wide has one-half of its width obstructed by a dam it necessarily doubles the volume of water which flows over the unobstructed half, and neither the court nor the jury is bound to believe such testimony as that of the witness Randle, who, when asked where the water which fell on Carlisle's land would go, answered: "It would go in the ground; it is awfully sandy there." Wortman v. Young (Tex. Com. App.) 235 S. W. 559. The testimony is uncontradicted both from appellee and Carlisle that the latter refused to take any part in the construction of the embankment or to bear any of the expense thereof until appellee had obligated himself in writing to protect Carlisle from any damages which might result to appellee's neighbors. This contract is a written admission by defendants that they knew the ditch and embankment would result in damages to their neighbors, and yet the jury found that it did not. "Verily I say unto you it passeth all understanding." Courts take judicial notice of the familiar and unquestioned laws of nature and of the existence of facts which happen according to the constant course of nature as well as of the primary and commonly known laws of physics. We know that water runs down hill. Falkenstern v. Town of Greenfield, 145 Wis. 232, 130 N. W. 61. We know that flood waters overflowing the bank of a creek will seek their lowest level, and that when a portion of such flood waters is diverted it will increase and deepen the flood elsewhere in the water course.

"The best and highest proof of which any fact is susceptible is the evidence of one's own senses. This is the ultimate test of truth, and is therefore the first principle in the philosophy of evidence. He who denies or doubts the evidence of his own proper senses, will, of course, deny or doubt the existence of matter, and be an universal skeptic; and to such a mind, there can be no such thing as proof; for if he distrusts his own senses, he will be much more distrustful of the testimony of others as to the evidence of their senses. Hence autopsy or the evidence of one's own senses furnishes the strongest probability, and indeed the only perfect and indubitable certainty, of the existence of any sensible fact." Gentry v. McMinnis, 3 Dana (Ky.) 382.

"Evidence, to be believed, must not only proceed from the mouth of a credible witness, it must be credible in itself—such as the common experience and observation of mankind can approve as probable under the circumstances. We have no test of the truth of human testimony, except its conformity to our knowledge, observation and experience. Whatever is repugnant to these belongs to the miraculous, and is outside of judicial cognizance." Daggers v. Van Dyck, 37 N. J. Eq. 130; Vreeland v. Vreeland, 48 N. J. Eq. 56, 21 Atl. 627.

For this reason the courts frequently declare that "the inherent improbability of the story is sufficient to negative the testimony of any number of witnesses" (Dodge v. Post [D. C.] 76 Fed. 807), or that "the gross improbability of an alleged occurrence outweighs and overcomes the affirmative testimony of many witnesses" (Cleveland Target Co. v. Empire Target Co. [C. C.] 97 Fed. 44). A witness may make a statement which is not

only abstractly improbable, but which is absurd, in view of physical facts, and yet without any controverting testimony whatever his story will fail to bring conviction to the triers. When a story is found "so utterly incredible that the court must have the faith of ten men to believe it" (The Rising Sun, 2 Rob. 104), so improbable that "if a dying martyr said it with his last breath it would stagger credulity" (Ex parte Thistlewood, 33 How. St. Tr. 876), courts should not be expected to believe such testimony.

"Where the evidence is conflicting, the extreme improbability of the fact alleged must be decisive of the controversy." Brewer v. Wilson, 17 N. J. Eq. 180.

As said by Van Fleet, Vice Chancellor, in N. J. Zinc Co. v. Morris Canal Co., 44 N. J. Eq. 398, 15 Atl. 227, 1 L. R. A. 133:

The witnesses "are all persons of such character and standing as entitles their testimony to full consideration. But the vital fact, as they state it, appears to me to be so improbable that their evidence, especially when contrasted with that produced by the complainants, must be rejected as incredible."

In another case it was said:

"I do not mean to disparage, or speak unkindly of, the witness; his statements may be strictly true, but the circumstances are such that I cannot accept them." Fleishman v. Steamer John P. Best, 9 Fed. Cas. 261, No. 4,861.

"Suppose that a small child should tell you that he saw a large wolf run away with an unusually small lamb. As against this ten adults testify that this was not the case at all, but that the real fact was that this very small lamb was actually running away with the large wolf. It would not take a jury very long to determine where the truth lies, notwithstanding 10 against one." Evans v. Philadelphia Bourse, 215 Pa. 652, 64 Atl. 463.

"There are well-settled and accepted natural laws, a recognition of which is justified by the long experience of men, the knowledge of everyday life, as well as by the studies and experiments of ages." All these the courts take cognizance of, such as the laws of gravitation, etc. Testimony which is directly contrary and in opposition to such laws should be ignored, even without contradiction. U. S. v. Post (D. C.) 128 Fed. 953.

See, also, Waters-Pierce Oil Co. v. Knisel, 79 Ark. 608, 96 S. W. 342; Tillson v. Maine Cent. Ry. Co., 102 Me. 463, 67 Atl. 407.

It is difficult to obtain from the record a definite idea of the appellees' theory of the case. On the other hand, appellants' theory is that the construction of the dam from near the foot of the hill on the west side of the valley diagonally southeast to the bank of the creek near the center of the valley, and across a slough, which the maps show was lower ground than appellants' land on the opposite side of the creek, unavoidably threw the volume of flood waters which before the construction of the dam flowed through said slough over appellees' land onto the lands of appellants. This theory is sustained by the physical facts, by a knowledge of natural laws, and by common understanding. Aside from their own testimony, the testimony of the civil engineer and his maps, the appellants introduced five witnesses. To sustain his defense the appellee introduced 10 witnesses, and the trial seems to have resolved itself into a primary election, in which the appellee was able to poll more votes than the appellee, and the jury declared the appellee duly elected. We believe, however, that a careful weighing of the oral testimony introduced in behalf of the appellee does not seriously conflict with appellant's theory.

Appellee Wilson testified that about 13 years prior to the trial of the case the channel of the creek was good, having an average depth of about 15 feet; that there was some timber and brush on the creek, and that it was something like 10 feet deep where it curved through Ben Hagin's place; that it was about 15 feet deep at the place where the slough broke out on Carlisle's land in 1917. He testified that prior to the construction of the embankment in question he built a dam near where the slough left the creek, for the purpose of throwing the water back into the original channel, but that it had been washed away. He further testified that below the point where the embankment and ditch touched the bed of the creek the water had washed the soil out something like 2 or 3 feet in depth. This, of course, was the water which would have found its way through the slough but for the embankment and was flowing around the lower end of the embankment back onto his land. He stated that after it was washed out he put a plank wall there, 3 planks high, which it seems was constructed of railroad ties for posts, and reinforced by hog wire on the southwest side of it, 2 or 3 feet from the fence, and the space between the plank and the hog wire filled in with rocks and brush, which he says was to prevent it from washing away. This fence was anchored by strong double-twisted wire, to blocks of timber, called "dead men," buried in the bed of the creek. He says he did this to throw the bank back to its natural height, and that this fence was no higher that the bank on the other side of the creek. The question arises, Why was not the east bank washed out at the same time? It seems that he made no effort to divert the flood water until after the unusual rise in the creek in the spring of 1917. He testifies that during that rise he was caught on the opposite side of the creek where he was picking plums, and had to stay over there all night because the bridge was washed out and he could not cross the creek; that the water was so high through the valley he would not undertake to go through there for fear it would wash off his team. He said:

"On both sides of the creek there was lots of water and a man advised me not to go through there."

By his pleading and his evidence appellee endeavors to justify his action in constructing the embankment by the fact that the bed of the creek on Carlisle's land below where the slough left the creek bed became clogged with driftwood and practically filled up with sand, and the further fact that Carlisle refused to permit him to burn out the driftwood and clean out the bed of the creek. Since the enactment of the above-quoted statute these facts constitute no defense to this action. He alleges that the big rise of 1920 brought down lots of driftwood, which caught in the creek and changed its course; that during said rise the drift caught in the plum thicket immediately below where the slough left the creek, causing the creek to quit the old channel and to run for 7 weeks down through the slough for a mile and a quarter, across his land. He testified:

"I didn't construct any ditch on the Carlisle land north of my land there. I had nothing to do with the ditch that was there—it washed out."

It is difficult to reconcile this statement with the written contract made with Carlisle and the physical fact that the ditch and embankment are there upon the ground. A careful reading of the appellee's testimony indicates that his contention is that Hagins' land was overflowed by water which came down Wilson's draw, which according to one of the maps is a water course lying east of Duck creek, flowing south, from its own watershed north, to its junction with the creek on Ben Hagins' land. This theory is reasonable, but it does not rebut the fact that if this volume of water is supplemented by the overflow which naturally passed over appellee's land the damages by overflow to Hagins' property is increased. The importance of this contention is weakened by the fact that a dam had been built across Wilson's draw about a mile and a half north of the premises in controversy, creating a lake which covers about 100 acres of land when full, and by the further fact that the water has never run over the spillway of this dam but once since its construction, and that was in the rise of 1920. A great deal of testimony was introduced by the appellee for the purpose of showing that during the rise in Duck creek water would flow east across Carlisle's land into Wilson's draw, thence down across appellant's premises. Admitting this to be true, but for the dam this volume of water would not have been supplemented by the water which previously followed the course of the slough through appellee's land. If none of the flood waters of Duck creek overflowed appellee's premises, then why the dam? If, as appellee contends, since the construction of the embankment and ditch less water flows over Ben Hagins' land than flowed prior thereto, then the question arises, how can the holes and gullies, some of them 15 to 30 feet deep, through said land, since the construction of the ditch, be accounted for? He says he did not do the work on Carlisle's land, and did not remember who did it; that he never paid him to do it, and did not enter into any contract with him with reference to his land. He admits, on cross-examination, that if he had not dug the ditch the water that came out of the creek would have all run south on his land, and in the same connection denies that the digging of the ditch threw any water over on Hagins' land. He said:

"I dug that ditch to turn the water off of my land, but the digging of the ditch did not turn it onto Mr. Hagins' land."

And to sustain such a theory 11 witnesses were introduced. On re-examination he testified:

"The constructing of this ditch does not cause any more water to overflow on Hagins' land than did overflow on it before the creek became obstructed and the ditch built. I have had as much overflow water on my land since the construction of this ditch as there was before it was constructed."

The question arises in connection with this statement: Why should he go to the expense of repairing the embankment after each rise? Courts are "not so deaf to the voice of nature, or so blind to the laws of physics, that every utterance of a witness in derogation of those laws will be treated as testimony of probative value * * * simply because of its utterance." Hook v. Missouri Pacific Railway, 162 Mo. 580, 63 S. W. 362.

In Groth v. Thomann, 110 Wis. 496, 86 N. W. at page 181, Justice Marshall uses this language:

"When physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith. The fact, established by the situation itself and matters of common knowledge, so clearly that no one can reasonably dispute it notwithstanding evidence to the contrary, must stand uncontroverted and uncontrovertible, condemning as false such contrary evidence, either upon the ground of mistake or something worse."

In the case of McLeod v. Miller & Lux, 40 Nev. 447, 153 Pac. 566, 167 Pac. 27, the Supreme Court of Nevada had under consideration an action for damages in which McLeod alleged that the defendants, by maintaining a dam across a river, had caused a deposit of silt upon his property more than 4,000 feet up the stream from the dam, such deposit being in the upper end of a second dam situated above the defendant's dam.

The levels taken by the civil engineer showed that the fall of the river was about one foot to the 1,000, which would make the bed of the river at the lower dam about 10½ feet lower than the upper point of overflow. The evidence showed that the water flowed over the lower dam, which was never more than 5 feet high, and that the impounded water never reached to the top of the upper dam. In reversing a judgment for the plaintiff the court said:

"An application of these established laws of nature to the facts of this case illustrate the reason why the opinion of non expert witnesses upon the ultimate fact in the case ought not to be permitted. Courts are bound to apply known natural laws so far as they are applicable. A lack of knowledge of known natural laws may cause a witness to form an entirely erroneous opinion as to the cause of a certain effect. The witnesses in this case who testified that the Spragg, Alcorn & Bewley dam was the cause of the overflow were undoubtedly perfectly convinced of the correctness of their opinion and honest in its expression, but the physical facts and known laws of hydraulics are conclusive that those opinions were in part, at least, erroneous."

See Seiwell v. Hines, 21 A. L. R. 141, note. The case of Falkenstern v. Town of Greenfield, supra, was one in which appellant sued the city of Greenfield for causing his land to be overflowed and barn to be washed away by the erection of a bridge across a creek below his mill property. The evidence showed that there were only a few acres of land between the bridge and a dam' which the appellant had constructed across the creek above the bridge and his barn. Appellant contended that the construction of the bridge had caused the creek below it to be filled up and that during an ordinary freshet the flood waters caused by the obstruction had washed his barn away. It appears that during the night when the barn was destroyed the dam was broken 'by the freshet. In affirming the judgment for the town, the court said:

"The claim of appellant that the natural flow of the stream below the dam augmented by water which came into the creek from the few acres of surface on the right bank was so obstructed at the bridge as to overflow the creek bank on the left side in such quantity as to form a deep, powerful torrent reaching to and engulfing the barn and granary, located as indicated in the statement, overturning the latter and causing the former to collapse and float away, is too incredible for belief. The story told by appellant that the occurrence to the barn took place long before the dam went out taxes our credulity at least to the limit. There is a boundary beyond where a witness cannot go and have his evidence entitled to any weight in determining the truth as to a controverted question of fact. It is a mistake to think everything which a witness may say under oath, however preposterous, is proof. The story of a witness on the stand, uncontradicted by any instrument or statement from the mouth of any other witnesses may, in the light of physical situations and matters of common knowledge, convict him of at least being conclusively mistaken. * * * The laws of nature cannot be turned aside by the story of any witness or number of them. Water will flow down hill and in all such directions till it comes to a level and a few inches of disturbance of the level within such distances as are material to this case, that is from point to point in the territory bounded by the creek, the dam, the mill flume and race and the highway, will inevitably, in case of the volume being large, cause a rapid, forceful flow. The lay of the ground was such that before water in the downward course on the left side of the creek was sufficient to reach and do the damage to the buildings complained of, must have been several feet deep and in a stream reaching from bank of the creek toward the flume over 100 feet 'and below the mill, covering practically the whole width between the creek and the tailrace, a distance of nearly 200 feet. It cannot be that water flowing into the creek just above the bridge formed any material part of such a great body. It must have come from above the dam primarily; territory hundreds of times greater in area than that served by the inflow to the creek between the dam and the bridge."

The testimony of all the witnesses is to some extent unintelligible because they were testifying from several different maps and the stenographer failed to note the particular locations upon the maps referred to in the testimony of witnesses as "through here," "over there," "down this way," etc.; but, if the evidence introduced in behalf of appellee is taken as a whole, it seems, aside from the opinions expressed, it tends to sustain appellant's theory. Many of appellant's witnesses had not visited the premises during overflows, several of them for years, and there is an element of uncertainty in the facts they state. Notwithstanding evidence which showed that the floods left driftwood and great quantities of sand and débris deposited on Hagins' land, and that the water washed up the crops, requiring the tenants to replant, and washed out gullies in some places 20 to 30 feet deep during the rise of 1922, according to W. P. Marshall, nevertheless some of the appellee's witnesses actually testified that such a flood was beneficial to the land of appellants. The question which suggests itself to us in this connection is: Why did not Wilson build his embankment on the other side of the creek and turn all of the water on his own land? Such testimony is as incredible as the assertion that the water was deeper on the Hagins side of the valley than it was on Wilson's side when the civil engineer's map shows that Wilson's land is much lower.

The witness Randle testified:

"The whole country down Duck creek overflows Carlisle's as well as others. I remember where the water broke out in 1917 and in 1920. I remember a depression there and water run-

ning down across Wilson's land before 1917 and 1920. I think I have seen water coming down there two or three times in my life before any of that land was put in cultivation. Down below where it is not cut out when we would get a big headrise it would come down through that place. * * * As to low places in Wilson's land west of the creek will state there is one low place there, or used to be; there used to be kind of a lake there."

### W. W. Moore testified:

"I farmed some of the land on section 153, the west half of 153, but I don't know that there was a slough running down across Wilson's land. It was level when I was there. They had ploughed it up, and there was a lake there which was located, I judge, about a quarter of a mile east of this ditch on the east quarter of 153. * * * There was a great deal more water coming down through that ditch than the creek would carry off; it was coming in over the ditch and the creek both."

### R. W. Moore testified:

"The water ran that way for about two years before Mr. Wilson built this ditch. It hadn't rained enough for it to run for some time but every year it rains enough it comes through there. I don't know whether as much water as overflowed in times of high water on Duck creek around on the west side of Wilson's land, and came on mine, since the construction of this ditch or not. There had been enough that came down that way to wash my fence down. I was not down there because the water was too deep for me to get there. As to whether the water was deeper on Wilson's side in 1922 than it was on Mr. Hagins' side, will state that I would say it would be about as deep on one side of the creek as it was on the other. The water didn't hardly go as far west as it did east of the creek; it went east of the creek something like 50 yards. In other words, it ran 50 yards further east from the corner than it ran west from the corner from the bridge. The water was scattered all over the country there and it ran on both sides of the creek pretty swift. This slough that I have referred to is just below the bridge, which is between the place where the creek broke out and washed away a part of the bank where it went into Mr. Wilson's place. This is the place where Mr. Wilson afterwards put the planks that I testified about. Prior to the overflow on May 7, 1922, there had been no slough there. This slough was cut there by this overflow in May."

### Will Taylor testified at length:

"As to whether or not I ever knew of any slough running out of Duck creek up in Walter Carlisle's place about the plum thicket, the creek breaking there and running down through Wilson and Carlisle's land and over on across the east half of section 153, will state I remember the water got out all along down the creek. There was no regular water course or anything like that prior to 1917 not out of the creek, but there showed to be before the land was put in cultivation. It showed a more or less of a drain there because the water would run down, but there was no lake or nothing that would make it drain. * * * I can't tell

where Duck creek is going to break out. Every rise makes some change in Duck creek. Sand will come down and pile up in a place and divert the overflow, and maybe when the next rise comes it will wash it out. Maybe there will be a hole in the creek in which you can go in swimming, and then a rise will come and fill it up."

### Jonas Carlisle testified:

"I can't say just when I was on that land the last time, but I have been on it once or twice since Mr. Wilson owned it, and I was on it several times when Mr. Will Nabors owned it, but I can't say whether there was a slough al the way across the east half of 153 from Duck creek on the north down to Duck creek on the south when Mr. Nabors owned it. I knew there was a big slough there, and whenever the creek got up it run a lot of water all the time, and Mr. Nabors built a tank there, and was going to do away with the lake, as we called it, and I told him it would not do any good, and sure enough the first big rain it washed out. From the time I first knew it I think more water went west of the creek than east of the creek, after this tank got full."

[10-14] The next contention is that, because it was shown without contradiction that part of the embankment and ditch had been constructed upon Carlisle's land, and he had not filed any answer in the case, the court should have granted the injunction requiring his land to be restored to its original condition by leveling the embankment and filling up the ditch. The writer thinks this proposition is sound, especially since Carlisle's testimony tended strongly to corroborate the evidence of the appellants. The ditch being constructed in violation of the statute, Carlisle could not lawfully assign to Wilson the right to injure third parties. He cannot transfer to another a greater right than he himself possesses, nor can he do indirectly through another what he could not do directly. Although Wilson denied in his testimony that he constructed the embankment on Carlisle's land, the weight of the testimony is that he acted according to their written contract, with Carlisle's consent and connivance, and was paid $150 to indemnify Carlisle against all damages which might result from its construction. That contract cannot transfer Carlisle's liability for a wrong which Wilson might do acting under it. Wilson paid him no consideration for the privilege of extending the embankment over his hand, and, if he had, it would not be binding, because a contract which contemplates the violation of a statute is void. The execution of the contract did not cut off Carlisle's locus poenitentiæ. They were both jointly and severally liable for maintaining the nuisance. 1 Cooley on Torts, 251. The contract evidences the fact that they were joint tort-feasors, and as such Hagins had a right of action against them, either jointly or severally. Blanton v. Kincheloe Irriga-

tion Co. (Tex. Civ. App.) 102 S. W. 744. If Hagans had sued Carlisle in a separate action, as they had the right to do, the contract gave Wilson no right to throw himself in the breach and defeat their action against a joint trespasser because the law leaves the injured party at liberty to pursue any one of them. 1 Cooley on Torts (3d Ed.) 224. Neither could Wilson claim the right to intervene in such a suit. In the case of McKee v. Coffin, 66 Tex. 304, 1 S. W. 276, the indemnitors of the United States marshal sought to intervene in the suit against him for conversion through the wrongful levy of a writ of attachment. Stayton, Justice, said:

"Fish Bros. & Co., have also appealed and assign as error the ruling of the court below refusing them leave to intervene. We are of the opinion that there was no error in this. According to the averments of their petition, they were but joint wrongdoers with the officer who executed, at their request, the process which they had sued out. The plaintiff was under no obligation to sue them at all. If there had been no objection urged against their intervention, to have permitted it would have done no harm. Such a course, when no objection was urged, has frequently been allowed; but the question now is, was it their legal right so to intervene? When one will be liable over to a party to an action, in case it is decided against him, as in the case of warranty of title to land, the statute frequently gives to the defendant the right to have the party who will be liable to him in case the action goes against him made a party defendant, or the right is sometimes given to the person so liable so to make himself. In the case before us no such facts are shown as give them any statutory right to become parties to the action. They claim the right to become parties solely on the ground that, to induce the defendant to do a wrongful act, they executed to him a bond, which the law recognizes as valid, whereby they have agreed to indemnify the defendant against any liability that may be fixed upon him, or discharged by him, on account of the act which they induced. This gives them no legal right to intervene in this case. * * * No right of theirs is imperiled by refusing to permit them to intervene. They were at liberty, by their own showing, in the name of the party to whom they became liable, to make any defense they could make were they parties to the record."

In that case it appears that because Fish Bros. had made the officer an indemnity bond which the law authorized and recognized as valid the indemnitors were at liberty, if they saw fit, to make the defense for and in the name of the United States marshal. But they could not intervene without the consent of the opposite party.

In the instant case there is no such bond. The recitals in the bond show that the parties to it expected that what would be done under it would result in damage to third parties. The law neither approves nor recognizes such a bond. The effect of the holding in the McKee Case is, where the wronged party sues one of the wrongdoers, in the absence of a statute permitting it, the other wrongdoer cannot inject himself into the case. This effectually separates the tort-feasors, one from the other. In the case at bar the judgment would have to be separate as to the defendants and to that part of the embankment built upon the land of each of them.

Wilson testified:

"I didn't construct any ditch on the Carlisle land north of my land there. I had nothing to do with the ditch that was there; it washed out. * * * I didn't do the work on Carlisle's land and I don't remember who did it. I never paid him to do it and I didn't enter into any contract with him on that—nor on his land. * * * This ditch is not all one ditch, and we have not been maintaining it together. This is mine up here and this is his here. There is a dam on my land and there is a washout ditch on his land."

If this testimony is true the appellants were entitled to a judgment by default against Carlisle, who had filed no answer, in so far as the destruction of the embankment upon his land is concerned.

[15, 16] Another ground of complaint is that appellee's counsel stated in argument to the jury that the defendant Carlisle ought to have been made a plaintiff in the suit, and that he was "in cahoots" with the plaintiff, and had filed no answer in the case. From Carlisle's testimony we may infer that he knew the construction of the embankments was injuring appellants and he had evidently made up his mind to do nothing further toward continuing the damages. This does not necessarily mean that he was "in cahoots" with Hagins. The argument is not such as would require a reversal of the case, but it is not proper matter for discussion. The question of necessary parties to an action is generally one for the court, and under the practice in this state, where one who should properly be a plaintiff declines to join in the suit in that capacity, he may be joined as a defendant. District Court rules 38 and 39; H. & T. C. Ry. Co. v. Hollingsworth, 2 Willson, Civ. Cas. Ct. App. § 173.

[17] After the jury had retired to consider the evidence the juror Gragson stated to the juror Aston that he (Gragson) had stood there on the dam and watched the water flow down the ditch, and he said it spread out over Wilson's land, but that he believed what Walter Carlisle swore about it. In his affidavit attached to the motion for new trial Aston stated that he had decided to answer the first two interrogatories in the affirmative, but that he was influenced by the statement of Gragson, in whom he had confidence, as well as by the court's special charges, and that if it had not been for such statements made by Gragson from his own personal knowledge of conditions he would not have

agreed to the verdict answering special issues Nos. 1 and 2 in the negative, but would have insisted upon answering such issues in the affirmative. He qualified his affidavit to some extent in his oral testimony given during the hearing of the motion for new trial, but still stated that what Gragson had said influenced him to some extent. The rule now is that, where the jury receives evidence not presented during the trial, it requires a reversal if the appellate court feels doubtful that it even in part affected any juror's finding. The test is stated in the last paragraph of Hines v. Parry (Tex. Com. App.) 238 S. W. 886, as follows:

"Feeling that the communication made was such as leaves it doubtful as to whether or not the verdict of the jury, in part at least, was not influenced against the defendant, we recommend that the judgments of the trial court and Court of Civil Appeals be reversed, and remanded for a new trial."

This test was approved by Cureton, Chief Justice of the Supreme Court, and would alone require a reversal. Rhoades v. E. P. & S. W. Ry. Co. (Tex. Com. App.) 248 S. W. 1064, 27 A. L. R. 1048; Lamar v. P. & S. F. Ry. Co. (Tex. Com. App.) 248 S. W. 34, 39; Payne v. Harris (Tex. Civ. App.) 241 S. W. 1008, 1012.

Because of this and other errors pointed out the judgment is reversed, and the cause remanded.

BOYCE, J. (dissenting). I am of the opinion that the judgment should be affirmed on the answer of the jury to the first and second issues. The appellee Wilson's theory of the cause was to the effect that the channel of Duck creek where it ran through Carlisle's land and in the big bend became clogged, causing the overflow of its banks above that point, resulting in the overflow both of Wilson's land and of defendant's land below this point; that the ditch and embankment put back into the channel of Duck creek the water that would otherwise have remained in the channel but for the clogged condition of the channel referred to; that the channel of Duck creek was sufficient to carry off the water after it had been turned back into its regular channel, and that the overflow on plaintiff's land was of water that overflowed the east bank of Duck creek a considerable distance above and north of the point where Wilson's ditch ran into the channel, and that the ditch had nothing to do with the overflow of plaintiff's land. The evidence on this issue was conflicting, but the defendant Wilson, the witness Marshall, and perhaps others, gave positive evidence in support thereof. The jury decided the conflict in appellee's favor, and the verdict, being sufficiently supported by the evidence, should not, in my opinion, be disturbed. Even if it is true that Wilson violated the provisions of section 53, c. 44, of the Acts of the Thirty-Fifth Legislature, Fourth Called Session, being article 5584½r, Vernon's Texas Civil Statutes, 1922 Supplement, in constructing the ditch and embankment, yet if it did not in any manner affect plaintiff's land they would have no right to enjoin its maintenance. The filing of such a suit would be the prerogative of the state, proceeding in pursuance to the provisions of the law referred to.

The finding of the jury on the two issues above mentioned is sufficient to dispose of the case, and any errors committed in the submission of the issue of damages would be harmless, and would not, in my opinion, require a reversal of the judgment.

The ditch and embankment were constructed in part over Carlisle's land and in part over Wilson's land. The work was done by Wilson with Carlisle's consent, under a contract by which Carlisle paid Wilson $150 in part payment of the cost of the work and in consideration also of Wilson's agreement to hold Carlisle harmless from all damages that might be recovered against Carlisle on account of its construction and maintenance. The ditch and embankment could not be separated into parts and serve the purpose for which it was constructed; the destruction of that part of Carlisle's land would render that part on Wilson's land useless. Under the circumstances under which it was constructed, Wilson, in my opinion, had a license or easement as against Carlisle's land in the matter of its maintenance. Harrison v. Boring, 44 Tex. 255, 267; Risien v. Brown, 73 Tex. 135, 10 S. W. 661. Carlisle could not himself, without Wilson's consent, have lawfully destroyed that part of the ditch and embankment that was on his own land, nor could he voluntarily have conferred that right on any one else. Wilson, in my opinion, had such an interest in that part of the ditch that was on Carlisle's land that he had a right to resist its destruction by Carlisle or any third person, and so to defend this suit. Carlisle's failure to answer cannot in reason deprive Wilson of this right.

The statement by appellee's attorney made before the jury in discussing the testimony of the defendant Carlisle "that he (Carlisle) was made defendant, when he ought to have been made a plaintiff—he has filed no answer in this case and is in cahoots with plaintiffs," was, in my opinion, within the range of legitimate argument. It is true that Carlisle, though a defendant, filed no answer. He was protected by Wilson's agreement of indemnity. He was called as a witness for the plaintiffs, and his testimony was favorable to them. There is a note of complaint against the defendant Wilson and criticism of Wilson's action in constructing the ditch and embankment throughout his testimony. In discussing this testimony the attorney had the right to call attention to these facts,

comment thereon, and convince the jury, if he could, that Carlisle's real attitude was one of sympathy for the plaintiffs and hostility to his codefendant, all of which might be considered by the jury in determining the weight to be given the testimony. The attorney has a wide range in the matter of the form of presenting his comments on the evidence; I do not think he was in this instance without this range.

I am of the opinion that the alleged misconduct of the jury does not require a reversal of the case. The court heard evidence on the issue. The juror Aston's evidence, given in this hearing, as to what transpired in the jury room, is materially different from the statement in his affidavit. It appears from his testimony and that of a number of other jurors that some discussion arose during the deliberations of the jury as to Carlisle's testimony. The particular part was, in substance, that when the creek got up it overflowed the ditch and had sandbarred some of his land and some of Wilson's land, evidently on the upstream side of the ditch and embankment. This testimony was favorable to plaintiffs in that it tended to show that the ditch and embankment were turning back into Duck creek a large amount of water that would otherwise have gone down over Wilson's land to the south and west of the ditch. At this juncture the juror Gragson said that he had seen the water running as Carlisle had testified, and believed Carlisle was telling the truth about it. The tendency of this unauthorized statement was thus favorable to the plaintiffs. The court, having heard the evidence, was amply warranted, I think, in finding that the statement of the juror was not in any manner prejudicial to the plaintiff's rights. It was within the "discretion of the trial court" to grant a new trial "if the misconduct of the jury proven be material." R. S. art. 2021. I am not willing to agree that the court abused his discretion in this instance.

For these reasons I respectfully dissent.

### On Motion for Rehearing.

HALL, C. J. [18, 19] We did not hold that article 5011t, Vernon's Ann. Civ. St. Supp. 1918, limited or modified the common-law rights of the defendant or any one else. On the contrary, we held, and still hold, that this article is merely declaratory of the common-law rights and liabilities of riparian owners as they are recognized in Texas and stated by the Supreme Court in Fort Worth Improvement Dist. v. City of Fort Worth, 106 Tex. 148, 158 S. W. 167, 48 L. R. A. (N. S.) 994. This article relates only to the diversion of surface waters, and that is exactly what appellee has done. In the case above mentioned the Fort Worth Improvement District, organized as such under title 73 of the statutes, and in the exercise of its right of

eminent domain, had "constructed almost to completion a levee along the banks of said West and Clear forks of the Trinity river. By the Holley plant the levee is constructed on the west bank opposite to plaintiff's property. That the old pumping station stands on the Clear fork of the Trinity river near the confluence of that stream and the West fork, and the levee is constructed on the opposite side of the river. " 'That before the construction of said levee these flood waters, which will now be confined within the levee, spread out over the valley in one continuous stream of water of approximately one mile in width with a depth of approximately two to five feet, and that said waters found their way back into the main channel farther down the stream.' " The result of the construction of these levees is described farther on in the opinion as follows:

"A basin of a given size is necessary to hold the water which naturally belongs to a water course, and if it is cut off on one side, it must be enlarged on the other; so that the raising of one of the banks, preventing the water from occupying the flood channel on that side, necessitates its occupying proportionately more space on the opposite side, and the increase of the water there must, of necessity, cause injury to the landowner; and the act is a direct violation of the maxim 'Sic utere tuo ut alienum non lædas' in that, for the purpose of relieving his own property of a burden, the owner merely transfers it to his neighbor."

This language describes a physical fact and states a natural law known and understood wherever there are water courses and overflows. It exactly describes the conditions and the result disclosed by the record in the instant case. Regardless of the testimony of witnesses and the verdicts of juries to the contrary, courts must take judicial knowledge of all such plain physical facts and natural laws.

[20] The appellee contends that this article of the statute relates only to the diversion of surface waters when the evidence shows that only the flood waters of Duck creek were diverted. We think a reading of the entire article clearly shows that by "surface waters" is meant overflow waters or such waters as during rains flow through any "gully, slough, ditch or other well-defined natural drainage." The civil engineer's map and evidence show that there was a slough through the appellees' land on the west side of the creek, and the uncontradicted evidence of appellants' witnesses shows that there was a lake or slough there several years before the flood of 1914, where early settlers obtained water by driving their wagons into it and filling their water barrels. The term "surface waters" is defined in Harvey v. Northern Pacific Ry., 63 Wash. 669, 116 Pac. 464, 466, as waters escaping from the banks of a stream at times of flood as contradistinguished from waters of

the stream in the absence of a flood, and it has also been defined as water derived from rains and melted snows. Standley v. A., T. & S. F. Ry. Co., 121 Mo. App. 537, 97 S. W. 244; Edwards v. M., K. & T. Ry. Co., 97 Mo. App. 103, 71 S. W. 366; Cairo, V. & C. Ry. Co. v. Brevoart (C. C.) 62 Fed. 129, 25 L. R. A. 527; Abbott v. K. C., etc., Ry., 83 Mo. 271, 53 Am. Rep. 581; Shane v. K. C., etc., Ry., 71 Mo. 237, 36 Am. Rep. 480; Morrissey v. C., B. &. Q. Ry., 38 Neb. 406, 56 N. W. 946, 57 N. W. 522; Crawford v. Rambo, 44 Ohio St. 279, 7 N. E. 429; O'Connell v. East Tennessee, etc., Ry. Co., 87 Ga. 246, 13 S. E. 489, 13 L. R. A. 394, 27 Am. St. Rep. 246; Jean v. Pennsylvania Co., 9 Ind. App. 56, 36 N. E. 159. While there are cases in other jurisdictions drawing distinctions between surface waters and other waters contrary to the definitions above given, it is clear from this record that the parties, the witnesses, the court, and the jury understood that the flood waters in this case were overflow waters described in the petition, and, as we think, are such waters as the Legislature intended in the enactment of the statute. The case was tried upon that theory below, and will be adhered to here.

It is true that Wilson testified that there was no slough leaving Duck creek on Carlisle's place and running through his land. While he is overwhelming contradicted upon this point the fact remains that during freshets flood waters covered the entire valley, and it is the diversion of this water by his ditch and embankment which is the basis of this suit, and the ditch and embankment constructed by him are stubborn and uncontradicted witnesses which destroy the entire theory of his defense and all evidence and findings of the jury to the contrary. The appellant does not, in his petition, complain of any water which the channel of Duck creek would hold, and he should not be made to suffer because this channel on Carlisle's land was clogged with driftwood or filled with sand. Such condition of the channel on Carlisle's land for which appellants are in no way responsible cannot justify the appellees in doing a thing directly resulting in injury to the appellants. The record shows that after the ditch, as originally constructed, from near the plum thicket on Carlisle's land, to the bed of the creek on appellees' land, did not protect appellees' land below the mouth of the ditch and west of the creek, that thereafter, as further protection, he built a levee upon the west bank of and parallel with the creek connecting with the lower end of the ditch and extending down the creek 150 feet. This levee was built by using railroad ties for posts, and with planks nailed to them, and with the addition of brush and wire netting. The tops of his posts were anchored to "dead men," buried in the bed of the creek. In building this 150 feet of levee he has done exactly what the Supreme Court said in the Fort Worth Improvement Co. Case, supra, a riparian owner had no right to do.

A flood of testimony was introduced to show that during overflows the water did not reach that part of the creek on Carlisle's land where the upper end of the ditch connected with the creek, but, on the contrary, that on account of the clogged condition of the channel on Carlisle's land the flood waters flowed across Carlisle's land and the Cheely place into Wilson's draw, and thence down across appellant's land. If this is true, then why did Wilson construct the embankment? If no water during freshets runs across the land, why does he object to the embankment being destroyed?

The fourth ground of his motion attacks that part of the original opinion in which we hold that, since Carlisle has filed no answer, the court should have granted an injunction as to him, requiring his land to be restored to its original condition. It is insisted that this holding is error, because "Wilson had the right for his own protection to resist the destruction or removal of the embankment and ditch by Carlisle or any one else." Protection from what? From flood waters, which one of his witnesses says "soaked into the sand" before it reached his embankment, and therefore never reached it? Or from flood waters that flowed east over Cheely and Carlisle's land and thence down Wilson's draw over Hagins'? If all this water flows east and disappears in the sand, then there is no necessity for his ditch and embankment. If it serves no useful purpose, and does not protect his land from overflow, then it should be destroyed, because, as described by the witnesses, it is certainly not ornamental, and tends in no way to beautify the landscape.

The motion is overruled.

BOYCE, J., dissents.